## 10975

### WILLIAMS v. BRUTON *ET AL.*

#### (113 S. E. 319)

1. LOGS AND LOGGING—CONVEYANCE OF RIGHT OF WAY TO FELL TREES AND ERECT SAWMILL DID NOT GIVE RIGHT TO USE SKIDDER AND RAILROAD.—An outstanding conveyance of timber with "free liberty of entry and right of way for vendee, his servants, agents, workmen and teams for the purpose of felling trees and to erect a sawmill thereon," etc., did not give the right to use a railroad and skidder, and the owner may recover for damages caused by such use.

2. TENANCY IN COMMON—ENTRY UNDER RIGHTS OF ONE COTENANT NOT TRESPASS, BUT CREATES LIABILITY TO OTHER COTENANT FOR UNAUTHORIZED INJURY TO LATTER'S INTEREST.—The transferee of outstanding contract rights to enter upon land with teams to cut timber, who, by contract with one cotenant of the land, had also acquired the latter's rights therein, was not a technical trespasser in building a railroad and using it and a skidder in excess of his rights to remove timber, but was accountable for all damages to cotenant's interest caused thereby.

3. DEEDS—CONSTRUED AGAINST GRANTOR IF AMBIGUOUS IN LIGHT OF CIRCUMSTANCES AND SUBSEQUENT CONDUCT OF PARTIES.—A deed capable of more than one construction is construed the more strongly against the grantor, but whether ambiguity warranting such construction exists must first be determined by reading the deed in the light of all the circumstances surrounding the parties when it was executed and of their subsequent conduct.

4. EASEMENTS—GRANTING OF RIGHT OF WAY DOES NOT CONVEY RIGHT
   TO BUILD AND OPERATE A RAILWAY.—A grant of "free liberty of
   entry and right of way for vendee, his servants, agents, workmen
   and teams" does not convey the right to build and operate a rail-
   way.

5. TENANCY IN COMMON—COTENANT CANNOT BUY ADVERSE CLAIM AND
   ASSERT IT AGAINST COTENANT HOLDING UNDER SAME TITLE.—Where
   cotenants held under the same title, one cannot, without the consent
   of the others, buy in an adverse claim or title and assert it for
   his exclusive benefit against the others.

6. TENANCY IN COMMON—WHERE ONE COTENANT GRANTS LICENSE TO
   PUBLIC SERVICE CORPORATION, OTHERS CANNOT BRING TRESPASS UN-
   LESS RIGHTS ABUSED.—Where one cotenant alone has granted a per-
   mit or license to a public service corporation to enter and construct
   its line, the other cotenants cannot bring trespass unless the right
   granted is excessively or negligently used.

7. PARTITION—GRANT OF ONE COTENANT TO PUBLIC SERVICE CORPORA-
   TION GIVES GRANTEE EQUITY TO DEMAND PARTITION.—Where one of
   several cotenants has granted a permit or license to a public service
   corporation to enter and construct its line, such grant may give the
   grantee an equity to require the grantor to exercise his right of
   partition in kind.

8. TENANCY IN COMMON—COTENANT BY CONVEYING EASEMENT CAN-
   NOT DEPRIVE HIS COTENANTS OF RIGHT TO RECOVER FOR INJURY TO
   THEIR INTERESTS:—One cotenant cannot by conveyance of a specific
   easement in the common property deprive his cotenants of their right
   to compensation or damages for injury to their interests by such
   grant.

9. TENANCY IN COMMON—COTENANT NOT ESTOPPED AS AGAINST GRAN-
   TEE OF HIS COTENANT WHERE CONTRACT EXPRESSLY RECOGNIZED HIS
   INTEREST.—Where one of two cotenants by a contract granted to a
   holder of timber rights in the common land a right of way for a
   railroad, and contracted to purchase the other's interest, the other
   cotenant was not estopped to assert such holder's liability to him
   for injury to his interest by the construction and operation of such
   railroad, since the contract expressly advised such holder of the
   latter cotenant's rights.

Before RICE, J., Richland, Spring Term, 1921.

Affirmed.

Action by Thomas C. Williams against J. C. Bruton *et
al.* Judgment for plaintiff, and defendant, Bruton, ap-
peals.

The decree appealed from was as follows:

This matter came before me at the Spring (1921) term of Court for said County, upon the testimony and exhibits reported by the master, under order of this Court. The record in the case is long and voluminous, some 33 or 34 references having been held, extending over a period of many months. The action is one for injunction and damages. The transactions between the parties litigant and others, as described by the testimony, and out of which arises the principal controversy, are many and varied, and it will be necessary, in taking up the consideration of the equities and law in the case, to state the undisputed facts, and such as in the opinion of the court are clearly established by the evidence. As was once stated by the lamented Justice Gage in an opinion delivered in the Supreme Court: "The facts breed the law." This statement peculiarly applies in the case now before us.

On or about June 8, 1910, the plaintiff, T. C. Williams, and one G. A. Blackburn, then residing in the city of Columbia, purchased from L. B. Owens a tract of land in said state and county, known as the Lykes Place, containing about 856 acres, and thus became tenants in common of the said Lykes Place in equal shares and proportions. The land in question lies on the Congaree river, below the city of Columbia, and most, if not the whole of it is what may be termed river or swamp lands. Some 50 or 60 acres of it appears to have been opened or tillable at the time of said purchase, and the remainder was covered more or less thickly with a growth of swamp timber. Very near to it, and, in fact, I think adjoining, the defendant Bruton owned a large body of similar timber. At the time of its purchase by Williams and Blackburn the Lykes Place was burdened with a mortgage to the Scottish-American Mortgage Company, Ltd., on which there was due some $425, and also a timber contract by said Owens to one

D. J. Carrison, dated July 1, 1907, to run 10 years from
that date, and in this decree it will be hereinafter referred
to as the Carrison contract.    During the events herein-
after recorded, Blackburn conveyed all of his interest in
the said lands to his wife, Annie G. Blackburn, and she
in turn conveyed the same to the defendant, E. C. L.
Adams, who is the owner at this time, subject, however,
to the timber rights of J. C. Bruton, as may hereinafter ap-
pear.

· In 1913 D. W. Robinson, of Pennsylvania, was the
owner of the Carrison contract, which at that time had
several years to run.    Whether or not Bruton at this
time had any knowledge of this contract does not appear,
but in a letter dated March 21, 1913, it was called to his
attention by the plaintiff, Williams, suggesting to Bruton
the advisability of its purchase by the latter.    Again, in
September, 1914, Williams writes Bruton on the same sub-
ject, and in 1915 Bruton did acquire the said contract and
all of the rights which it conferred.    A consideration of
Bruton's testimony and other evidence submitted in the
case satisfies me that in buying up the Carrison contract he
had in view not only the timber on the Lykes Place, but
the probable opportunity of laying a timber railroad across
the said place, which would be of great assistance to him
in moving his timber from the adjoining tracts.

Blackburn and Williams both knew and approved of
Bruton's purchase of the Carrison contract.    Of course,
from a legal standpoint, it is immaterial whether they ap-
proved or not, but, as subsequent events disclosed, they had
in view the sale to Bruton of their timber on the Lykes
Place after the expiration of the Carrison contract, and
also a right of way across the same for a timber railroad.

It seems clear to me that all of the parties recognized at
that time that under the labor and financial conditions then
existing, Bruton could not, with any profit to himself,
move the timber off of the Lykes Place with teams, and by

January 1, 1917, as set out and required in the Carrison contract.

Along in the early part of 1916 Blackburn and Williams began the transactions by which later on Bruton became interested in the timber on said lands and right of way across the same, over and above such rights as he had under the Carrison contract, and eventuated in this litigation. I will, however, state at this point that there is no evidence in this case which shows that Williams ever sold or conveyed to Bruton any rights of any kind in the Lykes Place, or any timber growing on same. All of his transactions of this kind were with Blackburn, and the latter dealt with Bruton.

Some time. during the month of March, 1916, Williams and Blackburn had reached an agreement, tentatively, at least, by which Williams was to convey to Blackburn all of his interest in the Lykes Place, and just prior to this, or at nearly the same time, Blackburn had about agreed with Bruton to sell to him all of his interest in the timber on the place, and a right of way across the said lands for a timber railroad, and, in case he secured Williams' part of the lands, to sell to Bruton the whole of the timber. The most of these transactions are in writing and in evidence, and will hereinafter be referred to. At or about the time mentioned Williams was just on the eve of his departure for Florida where he expected to be for several months. On the evening before he left, he and Bruton were both at the home of Blackburn at the same time, and on business concerning the Lykes Place. My recollection of the evidence is that both of them were there at the suggestion of Blackburn, but I do not think that that is material. Williams was to leave for Florida on the midnight train, but before that time he and Blackburn had reached an agreement by which Williams conveyed all of his interest in the Lykes Place and the stock, etc., to Blackburn. This was reduced to writing by Williams, and was signed by both of

the parties and witnessed by Bruton. This statement of facts is, I think, fully supported by the testimony of Williams and the letters of Blackburn, who died before this action was brought. The paper evidencing the said contract was left in the possession of Blackburn, and what became of it does not appear. It is not in evidence. At the time above mentioned, and in accordance with the terms of said agreement, Blackburn gave to Williams his personal check for $350, and that night Williams left for Florida as per schedule.

At the time these transactions took place, Williams had numerous judgments against him, which directly or indirectly were largely responsible for this litigation. After the departure of Williams, either that night or the next day, Blackburn examined the terms of said contract more closely and was not satisfied with it. He promptly wrote Williams that the contract, as drawn, did not cover the verbal agreement, and inclosed another, which had been drawn at his request by W. H. Townsend, Esq., now Judge Townsend, and in the same letter asked Williams not to use the check until the matter had been definitely settled. Williams refused to sign the Townsend agreement in its entirely, but had one page redrafted and signed the paper as changed, and returned it to Blackburn. The latter again promptly wrote Williams that the contract, as changed, was not satisfactory in all particulars, but that he would wait until Williams got back to Columbia, and he thought the difference could be worked out. The letters referred to, and the last two papers mentioned as contracts, are in evidence, and I am attempting to state only the substance of them.

Following closely upon the heels of the above event, Williams left Sarasota, Fla., to come to Columbia in his gasoline launch, and was on the water some time—about 60 days, as I recall—and, of course, could not be reached by wire or mail by Blackburn, who had the paper last men-

tioned in his possession. Not wishing to be bound by the terms of said paper, and fearing that he would be so bound if he retained it longer, Blackburn carried the same to W. H. Townsend, Esq., and, stating his reasons therefor as above mentioned, requested Mr. Townsend to take charge of it, which he agreed to do for a reasonable time. Prior to the times above referred to, Blackburn and Williams had attempted to farm the open lands on the Lykes Place, and had made various improvements on same, and in these transactions Williams became indebted to Blackburn as will hereinafter be referred to, and Blackburn to Williams.

Now, as neither Williams nor Blackburn ever attempted to hold each other to the terms of the contract drawn by the former the night he left for Florida, that goes out of the case, and the same can be said of the Townsend contract, except as it may be referred to in order to establish the differences between the parties. Williams returned to Columbia about the last of May, or the 1st of June, 1916. The contract which he signed was not returned to him by Blackburn, nor did he offer to return it after Williams got back, nor has the latter ever gotten it into his possession. The attorneys for Bruton argued that Williams did not ask for its return. This is true, but the evidence shows that he not only did not want it returned, but strenuously insisted that it be carried out by Blackburn. Of course, with the judgments mentioned above standing open, Williams could not convey to Blackburn a clear title. This the latter was well aware of, and Bruton also. Williams, anxious to get rid of the judgments, had, just before leaving, employed Mr. Craig, an attorney of the city of Columbia, to look after this for him, and he had made an arrangement with the judgment creditors by which he could settle them all, with the exception of one or two small ones, for the sum of $1,100. A reference to the paper signed by Williams will show that the cash to be paid him on the delivery of the contract was $1,127, and that this

money, when paid, he testifies, was to be used in settling
the judgments against him; that before leaving for Flor-
ida he had arranged with. Craig to receive said payments
and satisfy the judgments. Williams said he expected
Blackburn to get this money from Bruton. I think the
testimony of Williams and Craig together with all of the
circumstances which are undisputed, attending the trans-
action, established beyond question the truth of the above
statements. In both the Townsend and Williams con-
tracts it was admitted by Williams that he was due Black-
burn $719.26 on the farm operations for purchase of
stock, improvements, and taxes, etc. Blackburn had given
him a check for $350, and was to pay him $1,127 more in
cash, making a total of $2,196.26, for which Williams was
to convey to Blackburn all of his interest in the lands,
buildings, etc., and in the stock, farming implements, etc.
The land was to be free of all liens upon it except the mort-
gage of the Scottish-American Mortgage Company.

The main point of difference in the two papers herein-
before referred to as contracts was that in the Townsend
contract it was stipulated that, in case Williams could not
make the conveyance free of the judgments, then his
homestead right in the property was to stand as security
to Blackburn for the sum of $350 already paid to Williams
as above stated, while in the Williams contract the said
homestead right of Williams was to stand as security not
only for the sum just mentioned, but for the additional sum
of $1,127. In brief, the one contemplated no payment of
the $1,127 in case the liens of the judgment were not re-
moved, while the other contemplated that payment, even
though Williams was not able to get rid of the judgments.

On his return Williams finds that Blackburn has never
paid in the $1,127 payment, although Craig had made sev-
eral efforts to have him do so, and the judgments therefore
were still open and unpaid. Blackburn had been fully
posted by Craig as to Williams' instructions to pay the

judgments.   In the meantime Bruton had made a contract
with Blackburn to purchase the timber rights in the whole
of the land, and the right to run a timber railroad through
it, and had already begun to cut and remove the timber over
the said railroad.   Williams then gets busy trying to get
the $1,127 payment with which to settle the judgments.
Blackburn retains the contract, but will not pay.   He tells
Williams he will pay as soon as he can get it out of Bru-
ton.   The latter says he will not pay until the judgments
are removed.

On November 18, 1916, Blackburn, through Mr. D. W.
Robinson, of the Columbia bar, sends Bruton a copy of the
Williams contract, and Bruton says he took this to be suf-
ficient authority to go on with the construction of his tim-
ber railroad.

Under all of the circumstances of the case known to
Bruton, I do not think he was justified in cutting the tim-
ber without the payment of the $1,127 to Williams.   The
contract itself was ineffective until such payment.   Bru-
ton well knew that such payment had not been made.   I
do not think any man with unbiased judgment can read the
testimony and not be convinced that Bruton knew the very
low state of Williams' finances, and that unless he could
get the cash sum agreed to be paid by Blackburn he could
not have the judgments released.   I am satisfied also that
Bruton was well posted by Blackburn as to the latter's
transactions with Williams.   Bruton says that he did not
agree to pay for the Williams timber until he was sure that
he would not be interfered with by the judgments.   In my
own mind there is no doubt that both Bruton and Black-
burn knew that Williams depended upon the cash payment
of $1,127 with which to settle the judgments.   Except
what Bruton says there is no evidence that either he or
Blackburn was so very much interested in the judgments,
because, as Mr. Craig says, he had arranged to settle them
for $1,127, or less, which could have been easily effected

without risk to Bruton or to Blackburn. In the meantime, with Bruton sending Williams to Blackburn, and Blackburn putting him off to see Bruton, the latter builds his railroad and goes on cutting the timber, a one-half interest of which belongs to Williams. I am perfectly satisfied, from the course of dealing of the parties as disclosed by the evidence, that Bruton was fully posted as to the fact that Williams had only received the $350 and no more from Blackburn so far as the timber and land sale is concerned, and in spite of this he pays nothing to Williams out of the timber, but the whole of it to Blackburn. Williams testifies that the entire cash he has gotten out of the transaction amounts to $350, and the judgments still stand against him, and the evidence in the case justifies his statements, whereas, if the Blackburn contract had been carried out, the judgments would have been settled.

Bruton's testimony shows that both he and Blackburn knew that Williams depended upon the cash payment of $1,127 with which to settle the judgments. Taking all of the evidence into consideration, I am strongly of the opinion, and so hold, that Bruton was not justified under the law in proceeding to build a railroad over lands in which Williams had a one-half interest, and in cutting timber off of said lands, without the consent of Williams, and whatever damages Williams suffered by reason thereof Bruton must make good. I do not agree with the position taken by the attorney for the plaintiff that the Carrison contract was abrogated by the later contract of Bruton with Blackburn. I think Bruton had up until January 1, 1917, in which to cut the timber off of the Lykes Place and haul off with teams, but he had no right to use a railroad and skidder for that purpose. Therefore the use of the latter instrumentalities was unauthorized so far as Williams is concerned, and even prior to January 1; 1917, any damages that Williams may have suffered by reason of the use of

4—S. C.—121

said railroad and skidder must be compensated for by Bruton.

Since this litigation started the Lykes lands have been partitioned between the plaintiff Williams and E. C. L. Adams, who now owns the interest formerly owned by Blackburn. This was done under a written agreement had between Williams and Blackburn, and, so far as the evidence shows, the partition is not disputed. Williams' portion of the lands is now set apart to him. Anything done by Bruton on the lands set off as the Blackburn portion Williams has no concern with. Any damages awarded to him must be such as were done on the part of the Lykes Place, now said to be Williams' individual property. I do not think Bruton should be held to be a willful trespasser upon the lands of Williams. Whatever rights Blackburn had in the timber covered by the latter's contract with Bruton certainly passed to Bruton, and, as a division of the lands had not yet been had, Bruton and Williams were tenants in common of said timber. This being so, he could not be treated as a trespasser in disposing of property in which he had a one-half interest, but he should be held to account for whatever damages his cotenant suffered in such case.

Now, it seems to me that the evidence shows beyond a doubt that Bruton could not have removed the said timber off of the Lykes Place by teams at a profit. There is no reason to believe, then, that he would have removed it at all if he had not built his railroad on the property. So far as Williams was concerned, then, the building of the railroad was unauthorized, and caused him to lose his portion of such timber as was removed by Bruton after the railroad was put into operation. The unauthorized act, then, of building and operating a railroad and skidder on the Lykes Place was the direct and proximate cause of the loss of a part of the timber interest of Williams on the portion of the Lykes Place now set apart to him, and

for this Bruton must account, as well as for any other damages done said property of Williams by said railroad and skidder.

While there may be sufficient evidence before me to go into the question of damages, the press of my work is such that I cannot do this promptly, and, in order to speed the cause as much as possible, I will send the matter back to the master to pass upon the amount of damages which Williams has sustained in accordance with the principles above laid down, and, if further evidence is found necessary to determine this point, he is authorized to take the same.

As to the note of $375.80 which Bruton says he paid to the bank for Williams, at the request of Blackburn, Bruton was a volunteer. He was never requested by Williams to pay this. It was not necessary for him to make this payment in order to protect himself. He cannot be subrogated, therefore, to the rights of Blackburn against Williams, if he had any. The doctrine of subrogation is usually, if not always, applied in cases where the party paying a debt of another is forced to do so in order to protect himself. As I recall the evidence Williams testified that the note above referred to was made by him and Blackburn jointly, for the purchase of stock to go on the land, and that further, upon a proper accounting, Blackburn would have been indebted to him even after this note and the check for $350 had been paid. Bruton's remedy, then, if any, was against Blackburn, and not Williams.

Whatever time has been lost by Bruton in this cutting of the timber off of said lands by reason of this litigation should not be counted against him under this contract. The temporary injunction heretofore made in the case against Bruton must be and hereby is, made permanent, to apply, of course, only to the Williams' portion of said lands.

So ordered.

And it is further ordered that any party to this cause have leave to apply at the foot of this decree to any circuit

judge for any order which may be necessary to carry into effect the provisions of this decree.

*Messrs. Robt. Moorman* and *Lyles & Lyles,* for appellant, cite: *No restriction placed on character of instrumentalities to be used in logging*: 221 Fed. 402; *Deed will be construed against grantor*: 13 Cyc. 609; 2 Strob. 156; 12 Mill, 198. *Cotenant has right to grant right of way*: 70 S. C. 531; 35 S. C. 146; *Purchaser protected in dealing with one cotenant held out by others as the owner*: 84 S. C. 426; 67 S. C. 43; *Estoppel;* 57 S. C. 279; 72 S. C. 69; 2 Pom. Eq. Jur., Sec. 804.

*Mr. Halcott P. Green,* for respondent, cites: *Operation of railroad and skidder not permitted unless expressly contracted for*: 99 S. C. 158; *Negotiations merged in subsequent contracts*: 69 S. C. 93; 24 S. C. 124; *Right to partition timber*: 81 S. C. 492; 2 Strob. Eq. 145; 84 S. C. 505; *Tenant in common without consent of cotenants cannot grant right of way*: Ann. Cas. 1918c, 90; 222 Mass. 142; 69 S. C. 176; 33 S. C. 175; 106 Am. St. Rep. 750; 49 Am. St. Rep. 741; *Measure of damages:* 112 S. C., 2; Ann. Cas. 1918 B, 580; 204 Fed. 166; *To what extent new contract operates as discharge*: 3 Page Conts. 2076, Sec. 1340; 51 Fed. 113; 63 N. E. 67; 94 Fed. 385; 155 U. S. 303; 9 Cyc. 595e; 102 S. C. 130.

July 25, 1922.

The opinion of the Court was delivered by MR. JUSTICE MARION.

Action for injunction and for damages claimed to have been sustained by plaintiff on account of alleged unlawful entry and cutting of timber upon and building and operation of a lumber railroad across his interest in a tract of 856 acres of land, known as the Lykes Place, in Richland County. The complaint alleges that the plaintiff Williams, and Dr. G. A. Blackburn, on June 8, 1910, purchased from Lawrence B. Owens said Lykes Place,

subject to an outstanding conveyance of the timber rights by Owens to one Carrison, which rights were afterwards acquired by the defendant Bruton; that the timber rights under the Carrison deed expired on January 1, 1917; that in April, 1916, the defendant Bruton, holder of the Carrison timber contract, contracted with Blackburn, plaintiff's cotenant, for an extension of the timber rights granted in the Carrison deed, and for the right to construct and operate a railway on the land; that subsequently the interest of Blackburn in the land was acquired by Dr. E. C. L. Adams; that a partition in kind was had between the plaintiff and Adams; that the defendant Bruton, his agents and servants, and certain other defendants named, had, without consent of plaintiff, and against his protest, unlawfully entered upon said tract and upon the portion since allotted and conveyed to plaintiff in severalty, and had cut down and carried away a large quantity of timber, had opened up a right of way of 50 feet in width, and built and operated thereon a railway, etc; that thereby plaintiff had been injured and damaged; and that such injuries and trespasses were continuing at the time of the commencement of the suit. The answers of defendants put in issue the material allegations of the complaint. The cause came on to be heard before Hon. Hayne F. Rice, Circuit Judge, who filed a decree awarding a permanent injunction to plaintiff, and referring it back to the master to ascertain the damages sustained by the plaintiff. From this decree, which will be reported, the defendant Bruton appeals upon exceptions which raise substantially the following points:

(1)   That the Circuit Judge erred in adjudging that the defendant Bruton was liable to plaintiff for damages on account of any cutting of timber prior to January 1, 1917, in that, by the terms of the Carrison contract acquired by Bruton, he was the absolute owner of all timber and trees on the Lykes Place, with the right of removal, up to January 1, 1917, and that, as an incident to such owner-

ship, he had a right to use skidders or any other approved method of cutting down and removing the timber, including the right to use a railroad for such removal.

(2) That his Honor should have found and decreed that Blackburn, as a tenant in common of the land, had the right to convey a right of way for a railroad to Bruton over the entire tract of land, and that, having done so, Bruton was not liable for any damages on account thereof.

(3) That his Honor should have found and decreed that the sale by Blackburn to Bruton was with the full knowledge and consent of Williams, and that Williams was estopped to deny that Bruton had thereby acquired a right of way for his railroad and also the right to cut all timber on the place under the terms of the Blackburn contract.

1. The question of law raised by the first point is to be resolved in contemplation of the following facts: The Carrison contract, of which Bruton was the owner and holder, conveyed unto Carrison "the timber and other trees standing, growing, and being" upon said Lykes Place, together with bough tops and bark of said timber and trees, "with full and free liberty of entry and right of way for the said vendee, his servants, agents, workmen, and teams in, through, over, and upon the said premises, for the purpose of felling, cutting down, and carrying away the said trees," etc., and "to erect a saw mill thereon," etc. The limit of time given vendee was 10 years from January 1, 1907, the date of the instrument. Under date of April 26, 1916, about eight months before the expiration of the Carrison contract, the defendant Bruton and Blackburn, plaintiff's cotenant, entered into a contract, reciting among other things that Blackburn had contracted to purchase the plaintiff's half interest in said lands, whereby Blackburn granted unto Bruton a right of way fifty feet in width for the purpose of building and operating a railroad across said lands, and agreed, in the event of the consummation of his

trade with Williams for his half interest in the lands, to convey to Bruton all the timber upon certain terms and subject to certain reservations, and, in the event the Williams interest should not be acquired, to convey to Bruton the one-half interest of said Blackburn in the timber on the lands upon stipulated terms. It was further agreed that, if Blackburn did not acquire the rights of Williams, then Bruton was to indemnify Blackburn for any amount he might be required to pay Williams on account of the grant of said right of way. Following the execution of this contract Bruton or his agents appear to have entered upon the land, to have constructed his railroad thereon, and to have proceeded with the cutting and removing of timber. To what extent that undertaking was carried prior to January 1, 1917, date of expiration of the Carrison contract, does not satisfactorily appear from the record. It seems to be conceded, however, that Bruton continued to operate his timber railroad and to cut and remove timber after January 1, 1917, and up to September 20, 1919, the date of the commencement of this action. We are content with the Circuit Judge's findings of fact upon this phase of the case to the effect that the railroad was constructed without the consent of Williams; that the timber on the Lykes Place could not have been profitably removed with teams; and that there is no reason to believe that Bruton would have removed it at all if he had not built the railroad on the property.

Upon the question of Bruton's liability to the plaintiff, Judge Rice's legal conclusions are thus stated:

"I think Bruton had up until January 1, 1917, in which to cut the timber off of the Lykes Place and haul off with teams, but he had no right to use a railroad and skidder for that purpose. Therefore the use of the latter instrumentalities was unauthorized so far as Williams is concerned, and, even prior to January 1, 1917, any damages that Williams may have suffered by reason of the use

of said railroad and skidder must be compensated for by Bruton. * * * I do not think Bruton should be held to be a willful trespasser upon the lands of Williams. Whatever rights Blackburn had in the timber, covered by the latter's contract with Bruton, certainly passed to Bruton, and, as a division of the lands had not yet been had, Bruton and Williams were tenants in common of said timber. This being so, he could not be treated as a trespasser in disposing of property in which he had a one-half interest, but he should be held to account for whatever damages his cotenant suffered in such case."

An essential premise of the conclusion thus reached is the holding that, under the terms of the Carrison contract, the right to build a railroad on the land and to remove the timber by the use of a railroad and skidder was not granted. We are not inadvertent to the principle that, where a deed is susceptible of more than one construction, the words should be "more strongly construed against the grantor." 13 Cyc. 609; *Foy v. Neal*, 2 Strob. 156; *Peay v. Briggs*, 2 Mill. Const. 98, 12, Am. Dec. 656. But in determining whether such doubt exists as to require the application of that principle the deed should be read "in the light of all the circumstances surrounding the parties when the deed was executed, and also of their subsequent conduct relative to it." *Stephens v. Long*, 92 S. C. 65, 75 S. E. 530, and cases therein cited.

So construing the Carrison contract in the light of the holding of this Court in *Ellerbee v. Lumber Co.*, 99 S. C. at page 170, 82 S. E. at page 1051, that "the operation of a steam car on woodland is an uncommon burden on the servient estate, and ought to be the subject of special agreement," we are of the opinion that the Circuit Judge's interpretation of the Carrison instrument was correct. The right of way therein specifically granted was "free liberty of entry and right of way for the said vendee, his servants, agents, workmen and tenants." That the right

to build and operate a railway, entailing the hazards of fire and other risks of injury, was not thereby granted seems to have been the construction placed upon the Carrison contract by Bruton himself as evidenced by his purchase of the railroad right of way from plaintiff's cotenant, Blackburn.

If, then, Bruton's building of the railroad and removal of timber by that means were not warranted under the Carrison contract his rights in relation thereto must be referred to the Blackburn conveyance. If it be conceded that Blackburn's grant of a right of way to Bruton was sufficient to absolve him from liability as a technical trespasser (*Granger v. Tel. Co.,* 70 S. C. 531, 50 S. E. 193, 106 Am. St. Rep. 750), it does not follow that Blackburn's cotenant, Williams, was without remedy for any actionable injury thereby resulting. The most liberal test for liability which the defendant Bruton is entitled to invoke is this: Suppose Blackburn himself had purchased the Carrison contract and had undertaken to remove the timber by January 1, 1917, by means of a railroad and skidder. The authorities are practically uniform in affirming the rule that, where cotenants hold by and under the same title, one cotenant cannot without the consent of the others buy in an outstanding adversary claim or title and assert it for his exclusive benefit to the injury and prejudice of the interests of his cotenant. 39 Cyc., 40; 7 R. C. L., pp. 857, 858. If as such purchaser of the Carrison contract Blackburn could only have made it effective to remove the timber on the common property by building a railroad, a right not thereby granted, his appropriation of the common property for the purpose of building such railroad in order to avail himself of the exclusive benefits of the Carrison contract would clearly have been in derogation of the equitable rights of his cotenant, Williams. Obviously, the authority which Blackburn conferred on Bruton could not be extended to cover acts resulting in in-

jury to Williams which Blackburn himself could not legally do. 7 R. C. L. p. 910; *Omaha & Grant S. & R. Co. v. Tabor,* 13 Colo. 41, 16 Am. St. Rep. 185; note 116 Am. St. Rep. 372. The application of the principles stated to the facts of the case at bar justifies the conclusion of the Circuit Judge.

2. As to the second proposition—that Blackburn as a tenant in common had a right to convey a railroad right of way over the entire tract, and that Bruton, as grantee, was not liable for any damages on account thereof—this Court has held that, where one tenant in common has granted a permit or license to a public service corporation to enter and construct its line, there is no foundation for an action of trespass in the absence of evidence of excessive or negligent use of the right granted. *Granger v. Postal Teleghaph Co.,* 70 S. C. 528, 50 S. E. 193, 106 Am. St. Rep. 750; *Mason v. Telegraph Co.,* 71 S. C. 153, 50 S. E. 782. Such grant may give the grantee an equity to require the grantor to exercise his right of partition in kind. *Railroad v. Leech,* 33 S. C. 181, 11 S. E. 631; Id., 35 S. C. 146, 14 S. E. 730; Id., 39 S. C. 446, 17 S. E. 994. But one tenant in common cannot, as against his cotenants, by the conveyance of a specific easement in the common property, deprive his cotenants of their right to compensation or damages to the extent their interests are injuriously affected by such grant. *Railroad v. Leech,* 33 S. C. 180, 11 S. E. 631; *Railway Co. v. Reynolds,* 69 S. C. 481, 48 S. E. 476; *Foster v. Foster,* 81, S. C. 307, 62 S. E. 320; 7 R. C. L. 884, § 79. The conclusion of the Circuit Judge upon this point is approved.

3. Appellant's third contention, viz., that the plaintiff, Williams, was estopped to assert the liability of the defendant Bruton, as alleged, cannot be sustained. We agree with the Circuit Judge that the evidence does not establish that Bruton was misled to his prejudice by the conduct of Williams. The principle invoked

by appellant, that if one "knowingly suffers another to purchase and expend money on land under an erroneous opinion of title" he cannot afterwards be permitted to assert his legal right against that person (*Pollock v. Pegues,* 72 S. C. 69, 51 S. E. 514; *Latimer v. Marchbanks,* 57 S. C. 279, 35 S. E. 481), does not apply. By the express terms of the contract with Blackburn, Bruton was fully advised of the outstanding rights of Williams.

The exceptions are overruled, and the judgment of the Circuit Judge is affirmed.