12743

CAROLINA & N. W. RY. CO. v. ALEXANDER, MAYOR *ET AL.*

(151 S. E., 893)

April, 1927.

94

*Messrs. J. H. Marion, John B. Hyde,* and *John A. Marion,* for appellant,

*Messrs. Hart & Moss,* for respondents,

October 10, 1929.

The opinion of the Court was delivered by Mr. Justice Blease.

The decree of Hon. E. C. Dennis, Circuit Judge, who heard this case, properly disposed of all the material questions in the case, and it is affirmed.

Messrs. Justices Stabler and Carter concur.

Mr. Chief Justice Watts and Mr. Justice Cothran dissent.

Mr. Justice Cothran (dissenting) : This is an action to enjoin an alleged encroachment by the authorities of the Town of Clover, upon the right of way claimed by the railroad company, in the construction of a hard-surfaced street through the town, parallel with the railroad track, on the east side thereof.

The railroad company alleges title to an easement of right of way, extending at right angle from the center of the track, 65 feet on each side. It, however, concedes that the town, for many years, has maintained a street upon a part of the right of way on the east side of the track, and does not now claim the right to restrain the occupation by the town of the entire 65-foot strip; it alleges that the street or road as it heretofore existed did not come nearer than within 20 or 30 feet of the center of the track, but that in the proposed construction the improved street will come within less than 15 feet of such center; that such encroachment will constitute an invasion of its rights, and will interfere with the maintenance and operation of its enterprise; it apparently does not object to the occupation of 50 feet of its right of way for the improvement, but objects to the taking of more than that, and asks for an injunction to prevent the occupation of more than the 50 feet.

The answer of the defendants contains a denial that the railroad company owned any right of way through the Town of Clover, upon the right of way claimed by the railtracks and ditches; an allegation that the street intended to be paved had been used by the town under a claim of right for more than 40 years; and that the proposed improvement did not come nearer to the track than the street or road as it formerly existed.

The plaintiff made application to his Honor, Judge Featherstone, for a temporary injunction, which was refused; his Honor, however, required the defendants to give a bond of indemnity.

Thereafter the case came on to be heard by his Honor, Judge Dennis, at the April term, 1927. Upon the call of the case, counsel for the plaintiff moved for an order framing certain issues, as the case was one in equity. A jury was impaneled, and at the close of the testimony, his Honor submitted a series of issues of fact, the first of which was:

"Is the paved road any nearer to the Railroad track at its closest point or points, than was the road before it was paved?"

He directed the jury that if that question should be answered by them in the negative, they need not consider the other four issues submitted. The jury returned a verdict answering that question in the negative.

His Honor, Judge Dennis, thereafter filed a decree concurring in the finding of the jury and holding, in addition, that the railroad company had acquired no greater right to a right of way than the ground actually occupied by its tracks, ditches, and embankments.

From this decree the plaintiff has appealed.

It will be observed that the present appeal involves not only the right of the railroad company to the easement in reference to the 15-foot strip in question, but to its easements along its entire line from Chester to the North Carolina line, a matter of exceedingly great consequence and deserving most carful consideration. The decision of this appeal will also necessarily affect every other railroad company in this State, whose rights of way are similarly claimed.

Both parties claim from a common source, the owner or owners of the land through which the railroad track and the street or road ran. The town claims under a dedication of the land for a street by the former owner or owners and its use for more than 40 years. The railroad company claims the right, under its charter and those of its predecessors in title, to a right of way of 65 feet on each side of the track measuring from the center.

The claim of the railroad company requires a detailed and somewhat complex statement of the history of the several railroads involved and the constitutional and statutory enactments bearing upon the issue.

## I. Corporate History

The corporate history of the plaintiff railroad company appears to be this:

(a) In 1848 an Act was passed incorporating the Kings Mountain Railroad Company (11 St. at Large, p. 496), extending from the Town of Yorkville to a point on what was then known as the Charlotte & South Carolina Railroad, later the Charlotte, Columbia & Augusta Railroad, and now the Southern Railway, at Chester.

(b) The charter of the Kings Mountain Railroad Company was amended in 1851 (12 St. at Large, p. 81), in a particular which will be later noticed.

(c) The charter of the Kings Mountain Railroad Company was further amended in 1855 (12 St. at Large, p. 393), by authorizing the extension of the railroad from Yorkville to some convenient point on the North Carolina line.

(d) In 1873 an Act was passed incorporating the Chester & Lenoir Narrow Gauge Railroad Company (15 St. at Large, p. 393), extending from the Town of Chester, via Yorkville, to the North Carolina line, and authorizing a consolidation of that company with the Kings Mountain Railroad Company, under the name of the Chester & Lenoir Narrow Gauge Railroad Company, upon certain conditions relating to approval by the stockholders, which appear to have been complied with.

(e) In 1900, an Act was passed (23 St. at Large, p. 567), confirming the incorporation of the Carolina & Northwestern Railway Company in South Carolina (23 St. at Large, p. 221), reciting that the Carolina & Northwestern Railway Company was a corporation organized under the laws of the State of North Carolina, had filed its charter granted by North Carolina with the Secretary of State, and had complied with the laws by which foreign railroad corporations might become domestic corporations; the Act also ratifying and confirming the North Carolina charter. Section 2 of the said Act provided that the purchase by the Carolina & Northwestern Railway Company of the rights and franchises formerly vested in the Chester & Lenoir Rail-

road Company, and the operation of the said railroad in South Carolina be confirmed. This Act was dated February 17, 1900. By deed of Chester & Lenoir Railroad Company to the Carolina & Northwestern Railway Company, recorded in Book 16, p. 562, of York County, and by deed of G. W. F. Harper, master, to the Carolina & Northwestern Railway Company, recorded Book 16, p. 550, of York County, all of the property rights, franchises, and privileges of the Chester & Lenoir Railway Company were conveyed to the Carolina & Northwestern Railway Company.

Thus the plaintiff claims to have traced its title through its several predecessors, back to the Kings Mountain Railway Company, and that it is entitled to all of the rights and privileges, including the matter of the right of way, of such several companies, under the several Acts above referred to. We come, next, to consider the extent of such rights and privileges, as they affect the main issue in the case of the right of way of the plaintiff.

## II. Legislative History

(This, of course, includes constitutional as well as statutory provisions pertinent to the inquiry.)

(a) The Act of 1848, incorporating the Kings Mountain Railroad Company (11 St. at Large, p. 496), conferred upon the company all of the "powers, rights and privileges (with certain exceptions not pertinent hereto), granted by the charter of the Barnwell Railroad Company, to that company."

(b) The Act of 1847, incorporating the Barnwell Railroad Company (11 St. at Large, p. 475), in Section 11 provides:

"That in the absence of any written contract between the said company and the owner or owners of land, through which the said railroad may be constructed, in relation to said land, *it shall be presumed* that the land upon which the said railroad may be constructed, together with one hundred

feet on each side of the center of said road, *has been granted* to the said company by the owner or owners thereof, and the said company shall have good right and title to the same, (and shall have, hold and enjoy the same,) unto them and their successors, so long as the same may be used only for the purpose of the said road and no longer, unless the person or persons to whom any right or title of such lands, tenements or hereditaments descend or come, shall prosecute the same within ten years next after the construction of such part or portion of the said road as may be constructed upon the lands of the person or persons so having or acquiring such right to the title as aforesaid, and if any person or persons to whom any right or title to such lands, tenements or hereditaments belong, or shall hereafter descend or come, do not prosecute the same within five years next after the construction of the part of the said road upon the lands of the person or persons so having or acquiring such right or title as aforesaid, then he or they, and all claiming under him or them, shall be forever barred to recover the same: Provided: That nothing herein contained shall affect the right of *Femme coverts,* infants or persons beyond seas, until two years after the removal of their respective disabilities."

(c) The Act of 1851, amending the charter of the Kings Mountain Railroad Company (12 St. at Large, p. 89), in section 15, provides:

"In the absence of any contract or contracts with the said Company in relation to land through which the said road may pass, signed by the owner thereof, or his agent or any person in possession thereof, which may be confirmed by the owner thereof, *it shall be presumed* that the land on which the road may be constructed, together with the space of sixty-five feet on each side of the centre of said road, *has been granted* to the said Company, by the owner or owners thereof, and the said Company shall have a good right and title thereto, and shall have, hold, and enjoy the same, discharged from all prior liens, as long as the same may be

used only for the purposes of the said road, and no longer, unless the person or persons owning the said lands at the time the part of the said road which may be on the said land was finished, or those claiming under him or them, shall apply for an assessment of the value of said land, as hereinbefore directed, within two years after the said part was finished; and in case the said owner or owners, or those claiming under him, her or them, shall not apply for such assessment within two years next after the said work is finished, he, she or they shall be forever barred from recovering the said land, or having any assessment or compensation therefor: Provided, nothing herein contained shall affect the rights of *feme coverts* or infants until two years after the removal of their respective disabilities."

(Note.—It will be observed that the effect of this amendment was to reduce the presumed right of way from 100 feet, as provided in the charter of the Barnwell Railroad Company, to 65 feet on each side of the center of the track; and to reduce the limitation of time within which the landowner might apply for an assessment of the value of the land from 5 to 2 years.)

This amending Act provided also that the charter of the Kings Mountain Railroad Company should be exempt from the operation of Section 41 of the Act of 1841 (11 St. at Large, p. 177), which was as follows:

"That it shall become part of the charter of every corporation, which shall at the present, or any succeeding session of the General Assembly, receive a grant of charter, or any renewal, amendment or modification thereof, (unless the Act granting such charter, renewal, amendment or modification, shall in express terms except it,) that every charter of incorporation granted, renewed, or modified, as aforesaid, shall at all times remain subject to amendment, alteration or repeal, by the Legislative authority."

(d) The Act of 1855, further amending the charter of the Kings Mountain Railroad Company (12 St. at Large,

p. 433), after authorizing the extension of the railroad from Yorkville to the North Carolina line, vested the company with the same right of passage and right of way "as provided for in their present charter."

(e) The Act of 1873 (15 St. at Large, p. 393), incorporating the Chester & Lenoir Railroad Company, authorizing the construction of a railroad from Chester, via Yorkville, to the North Carolina line, and authorizing consolidation with the Kings Mountain Railroad Company, provided that it "shall have all the right and privileges conferred upon the Northeastern Railroad Company by their charter" (12 St. at Large, p. 129).

The charter of the Northeastern Railroad Company vests it with "every right, privilege, and power heretofore granted to, and which now is or has been used, possessed or enjoyed by any railroad company heretofore incorporated in this State, * * * and shall have the same presumptive right and title, and to the same extent to lands through which the said railroad, or any branch thereof may be constructed, in the absence of any contract with the owner or owners of such lands, which is possessed or enjoyed by any other railroad company as to lands through which their railroad or any branch thereof may have been or may be constructed, in the absence of any contract with the owners thereof" (§ 6).

In addition, the Act provides that upon consolidation with the Kings Mountain Railroad Company, the consolidated company should be vested with " all the rights, privileges, powers, immunities and franchises conferred upon said companies by this Act and the several Acts heretofore passed incorporating said companies and amending the charters thereof. * * *" (15 St. at Large, p. 395, § 6.)

In Section 5 of the Act of 1873, which preceded Section 6 authorizing a consolidation, and which of course applied to the corporation then being chartered, regardless of consolidation, it was provided:

"Provided, That said railroad shall be subject to the provisions of an Act entitled 'An Act to declare the manner by which the lands, or right of way over the lands, of persons or corporations may be taken for the construction and uses of railways and other works of internal improvement,' ratified September 22, A. D. 1868; provided, nothing herein contained shall be so construed as to exempt said company from the provisions of Section 1, Chapter 63, of the General Statutes of the State of South Carolina."

The Act of 1868 (14 St. at Large, p. 89), referred to, is practically reproduced in Sections 4990 *et seq:,* Vol. 3, Code of 1922. Section 1 of Chapter 63 of the General Statutes (Revised Statutes) of the State of South Carolina, A. D. 1873, declares that charters are subject to amendment, alteration, or repeal.

### III

The appeal turns upon the contention of the defendants that under the Constitution and the Condemnation Statute of 1868 (14 St. at Large, p. 89), practically reproduced in the Civil Code of 1922 (Sections 4990 *et seq.*), the entry of the railroad company upon the lands in question, without notice to the owner or owners, was not sufficient to vest the charter right of way in the Kings Mountain Railroad Company or in any of its successors. This is what his Honor, Judge Dennis, held, confining the title and possession of the railroad company to an easement of right of way in only that portion of the land actually occupied by the track, ditches and embankments.

There does not appear to be any doubt therefore that the plaintiff, Carolina & Northwestern Railroad Company, is vested with the charter rights of the predecessor railroad companies, in reference to the acquisition of rights of way, which were that in the absence of contract between the railroad company and the landowner, *it would be presumed* that the land upon which the railroad was constructed, to-

gether with a space of 65 feet on each side of the center of the track, had been *granted* to the company for railroad purposes; allowing the landowner a specified time within which to apply for an assessment of the value of the land, and providing that if he should not apply therefor, within the specified time, "he or he shall be forever barred from recovering the said land or having any assessment or compensation therefor."

The plaintiff offered evidence tending to show that no deed or written contract relating to the right of way through the town of Clover had ever been executed, and that no claim for assessment had ever been made by the landowner. There having been no evidence to the contrary, such may be accepted as established facts.

The validity of what shall be termed this *presumptive charter right,* perfected as far as it could have been by the plaintiff and its predecessors, has been called in question by the defendants, upon the ground, as has been stated, that under the Constitution of 1868 and under the condemnation statute of that year, notice to the landowner of the proposed· entry upon his land was essential to its acquisition.

His Honor, Judge Dennis, held:

"Had there been no provision in the charter of the Chester & Lenoir Narrow. Gauge Railroad Company requiring it to obtain its right of way under the provisons of the Condemnation Act of 1868, I would be of the opinion still that by the provisions of the Constitution of 1868, above referred to, the Chester & Lenoir Narrow Gauge Railway Company could acquire a right of way only after notice and upon compensation being made to the owners, and that by a jury as provided in the sections quoted. I so hold."

Counsel for the defendants observe in their brief:

"Perhaps an entry prior to 1868, without any contract with the owners, if the plaintiff established such noncontract entry, might have in two years ripened into a title, but certainly since 1868 no such noncontract entry or nonpermissive

entry can ever ripen into a title, unless written notice be given or notice to the landowner in some other form."

This presents concretely the main issues in the appeal.

The charter of the Kings Mountain Railroad of 1848 authorizing the construction of a railroad from Chester to Yorkville; that was prior to the Condemnation Statute of 1868; the Act of incorporation vested the company with the charter right of 100 feet on each side of the track under the conditions mentioned, which was reduced by an amendment in 1851 to 65 feet. Under that charter the railroad was completed some time about 1854. The amending Act of 1851 also provided that the charter should be exempt from the operation of the statute which permitted the repeal or amendment of existing charters.

Under a further amending Act of 1855, the extension of the railroad from Yorkville to the North Carolina line was authorized and the company was vested with the same charter right as to its rights of way. It appears that the railroad was not extended from Yorkville under this authorization. Later, in 1868, the Condemnation Statute was passed. It seems clear that so far as the Kings Mountain Railroad Company is concerned, the Act of 1868 could not divest rights which had been theretofore conferred upon it.

In the same year, 1868, the Constitution of that year was ratified. We do not think that the provisions of the Constitution of 1868 were intended to affect at all the charter right to a right of way under the conditions named, or that it was possible for it to have had that effect; it certainly was not intended to divest vested rights; and later all of the rights of the King's Mountain Railroad Company, so far as the acquisition of rights of way are concerned, was vested by the Act of 1873 in the Chester & Lenoir Railroad Company, which completed the line from Yorkville to the North Carolina line, passing through the town of Clover. The latter named company not only was vested with all of the rights which had been conferred upon

the Kings Mountain Railroad Company, but there were conferred upon it by the Act, specifically, the charter rights of the Northeastern Railroad Company, which were practically the same as those of the Kings Mountain Railroad Company, and *specifically conferred upon it the presumptive charter rights.* The fact that in section 6 of the charter of the Chester & Lenoir Railroad Company was made subject to the provisions of the Condemnation Statute of 1868 did not at all affect, and was entirely consistent with, the presumptive charter rights which were conferred by the Act, and which had been vested in the Kings Mountain Railroad Company. We think that it was intended simply to provide a method by which the Chester & Lenoir Railroad Company could acquire, by condemnation, rights of way when such condemnation became necessary by the attitude of the owners of the land through which the proposed construction ran.

## IV

But assuming that the presumptive charter right which had thus been acquired by the Carolina & Northwestern Railroad Company, the plaintiff herein, from the charters of its predecessors and from the Act of 1900, is to be controlled by the Constitution and by the Condemnation Statute of 1868, we think that .it is clear under the authorities that notice of entry upon the land to the landowner was not at all essential to the perfection of that right.

It appears that prior to the Condemnation Statute of 1868, there was no *general law* prescribing the manner in which a right of way for a railroad might be condemned; it seems to have been regulated by the provisions of the several charters of the railroad companies. The Legislature at that time passed the general law in question, which in its provisions is quite similar to the individual charters which heretofore had been issued.

In 11 Statutes there are not less than ten railroad companies chartered, and in each charter provision is made for

the condemnation of rights of way and for the presumptive charter right; and in 12 Statutes there are eleven, up to 1860.

In the case of *Lewis v. R. Co.*, 11 Rich., 91, speaking of the charter of the Wilmington and Manchester R. Co., the Court said:

"The general scheme adopted to secure to the company the right of way, and compensation to the landholder, is manifest. For the want of agreement as to the value of the land taken, or when it cannot be purchased, the XVI Section directs a valuation by commissioners, but in the absence of any contract, or of any valuation by commissioners, within ten years from the completion of that part of the road, the XVII Section authorizes the company to hold the land as long as it shall be used for the purposes of a road, and presumes a grant from the owner for that purpose; and should no application for an assessment be made within ten years, then the owner is forever barred from recovering the land or having any assessment or compensation."

The charter referred to contained practically what was later provided for in the Condemnation Statute of 1868, as well as the presumptive charter right; the two provisions being apparently entirely harmonious with each other, as otherwise they would hardly have been incorporated in the same act. The later Act of 1868 provided a general law of condemnation, without making any reference to the presumptive charter right with which it was not at all at variance. The same may be said of the twenty other charters issued between 1846 and 1868.

"A right of way may be acquired by a railroad company by purchase, by grant, by dedication, by adverse possession, by license, or by condemnation under the power of eminent domain. Or as said by a recent case, it may be by condemnation, purchase or voluntary grant, and also by estoppel, adverse possession or license." 2 Elliott R. R. (3d), § 1150.

There are then at least seven *distinct* modes, by any one of which a right of way may be acquired; purchase, grant,

dedication, license, adverse possession, estoppel, and condemnation. If the Act of 1868 be limited, as it is, to the mode of *condemnation* (without an express indication to that effect), we see no reason or ground for the contention that the Legislature intended to exclude all of the other modes of acquisition.

We do not doubt but that if the Chester & Lenoir Narrow Gauge Railroad Company had instituted proceedings to condemn, they would have been obliged to proceed under the Act of 1868, notwithstanding the fact that the charters of its predecessors provided a different mode of procedure. *McCrea v. R. Co.*, 3 S. C., 381, 16 Am. Rep., 729. But they did not do so and relied upon the presumptive right contained not only in the charters of its predecessors *but in its own,* which postdated the Statute of 1868. The Statute of 1868 was no more than a Legislative Act; the Act of 1873 which chartered the Chester & Lenoir Railroad was of equal force and dignity and subsequently enacted; and if it could be held that the Act of 1868 provided the only mode of acquiring a right of way, it must be deemed to have been amended by the later Act of 1873. *It was under the charter of 1873 that the railroad was extended from Yorkville to the North Carolina line, passing through the town of Clover.*

That the Act of 1868 had reference only to the mode of acquisition by condemnation is clear from the decision of this court in *Verdier v. R. Co.*, 15 S. C., 482, in which the Court said:

"The notice (to the landowner), was intended for the benefit of the company in cases of objection, *to give them a starting point to condemn the lands* but was unnecessary in cases of consent."

If the notice to the landowner was required only in the event of condemnation under that statute, it would be illogical to make it a condition precedent in the matter of the presumptive charter right, which does not contain such a

requirement. It would be as logical to require it in any one of the other six modes of acquisition.

In *Southern R. Co., v. Gossett, 79* S. C., 372, 60 S. E., 956, 960, construing practically the same presumptive charter right, in the charter of the Greenville & Columbia Railroad Company (11 St. at Large, p. 348), the Court said, citing *Harman v. R. Co.,* 72 S. C., 228, 51 S. E., 689:

"The presumption was that the plaintiff or its predecessors took 100 feet on each side from the center of the track."

The same ruling was made in the case of *Southern R. Co., v. Howell,* 79 S. C., 281 60 S. E., 677, which also cited the *Harman case.*

The respondents insist that these cases involving the charter of the Greenville & Columbia Railroad Company have no application, for the reason that that charter and the construction of the railroad antedated the passage of the Condemnation Act of 1868. That is immaterial; the point is that that charter provided for two modes of acquiring rights of way, condemnation and the presumptive charter right; the Act of 1868 provides only for condemnation; not at all inconsistent with the other mode; the cases are opposite in their construction of the charter as providing for the mode which the Act of 1868 does not interfere with.

His Honor, Judge Dennis, holds that even if there were no condition in the Act of 1873, requiring that in the condemnation the railroad company comply with the Condemnation Statute of 1868, the railroad company could not acquire a right of way without notice to the landowner, under the sections of the Constitution quoted by him, Article 1, Section 23, and Article 12, Section 3.

It is apparent that these sections are intended to safeguard the rights of the landowner, to limit the right of corporations *to condemn* private property for public uses. They do not purport to deal with anything but the power to condemn under the state's right of eminent domain, one and only one

method of acquiring a right of way. Like the Condemnation Act of 1868, all other modes of acquisition are not affected. To adopt the conclusion of his Honor, the circuit Judge, there would be no possible mode of acquiring a right of way except by condemnation; all of the others, grant, purchase, dedication, adverse possession, estoppel, and license, would be relegated to the scrap pile.

In the *Verdier case,* which was decided after the Act of 1868 was passed, and after the Constitution of 1868 was ratified, the Court held that the owner, standing by and allowing the construction of the railroad through his land, and allowing the time within which he could apply for a valuation of the property to run out, was estopped from setting up any claim to the property; *that it would be presumed that the railroad company entered by his consent.* It was not suggested in that case that there was anything in the Constitution that militated against such estoppel or presumption.

In that case the Court said:

"We think, as matter of law, the government would now be estopped from denying this permission, this executed license, and from recovering the lands, and, as a consequence, the plaintiff, who holds the title of the government, is also estopped. 'He who can forbid and does not, is deemed to have assented. * * * If one having title to land looks on and suffers another to purchase and expend money on the land without making known his claim, he will not be permitted, afterwards, to assert his title against an innocent purchaser.' Herman's Law of Estoppel, § 409.

"In *Hand v. R. R. Co.,* 12 S. C., 351, this Court said: 'If a party having title to property, or a right in respect therof, permits another to exercise authority over such property, or deal with such right, the latter shall not be subjected to damages by reason thereof, for *volenti non fit injuria.* This is a well-known legal principle, and, under its operation, a license to use both real and personal property is recognized as existing at law, both by deed and other

writing under seal and by parol, and is also presumed from the conduct and relationship of the parties when not in terms expressed.' "

In 22 R. C. L., 849, it is said:

"But one who stands by, without objection, and sees a public railroad constructed upon his land cannot, after the road is completed, or large expenditures have been made on the faith of his apparent acquiescence, enjoin, or otherwise deny, the railroad company the right to use the land, but will be left to his remedy of compensation. In such cases the owner will be presumed to have consented to the action of the railroad company in taking possession of his land, and impliedly agreed to accept a just compensation therefor, and to rely upon the statutory mode of obtaining such compensation."

In *Bourdier v. R. Co.*, 35 La. Ann., 947, cited in *Southern California R. Co. v. Slauson*, 138 Cal., 342, 71 P. 352, 94 Am. St. Rep. at page 61, it was said:

"If the entry was unlawful, the plaintiffs condoned it. They should at once and peremptorily have forbidden the entry of the defendant  *  *  *  if they intended to dispute its right to the roadbed."

In *Lawrence v. R. Co.*, 39 La. Ann., 427, 2 So., 69, 4 Am. St. Rep., 265, it was held, quoting syllabus:

"Owner of land, who knowingly permits a railway to be constructed upon it, without objection, is estopped from recovering possession of the land so used by such railway; but may, nevertheless, maintain an appropriate action for the value of the lands taken."

In *Goodin v. Cincinnati, etc., Co.*, 18 Ohio St., 169, 98 Am. Dec., 95, it was held, quoting syllabus:

"One who stands by, without objection, and sees public railroad constructed upon his land, cannot, after the road is completed, or large expenditures have been made on the faith of his apparent acquiescence, enjoin, or otherwise deny,

the railroad company the right to use the land, but will be left to his remedy of compensation."

In *Dulin v. R. Co.,* 73 W. Va., 166, 80 S. E., 145, Ann. Cas., 1916-D, 1183, L. R. A., 1916-B, 653, it is held, quoting syllabus:

"A landowner who sees a railroad company constructing its railroad through his land, and makes no objection until it is completed, is estopped to sue in ejectment, or enjoin the operation of the road."

## V

In 22 R. C. L., 850, it is said:

"A right of way may be acquired by lawful condemnation to public use, by adverse possession, by public or private grant, *or implied grant,* or by license."

The several railroad companies, predecessors of the plaintiff, enjoyed not simply an *implied* grant, but a conclusively presumed grant by virtue of the presumptive charter right conferred by the charters:

"In the absence of any contract  *  *  *  it shall be presumed that the land  *  *  *  has been granted to the company (which) shall have, hold and enjoy the same as long as the same shall be used for the purpose of said road and no longer."

It is exceedingly questionable, under the *Verdier case,* whether the defendants are in a position to question the right of way of the railroad company. The former owner or owners of the property certainly could not do so, and the parties who claim under them could acquire no higher right than they would have.

So that the owners of the land through which the railroad was constructed are not only estopped from disputing the right of the railroad company, but are presumed, by the terms of the statute, to have granted the right of way. Not only this, but they are barred by the statute from setting up any claim to compensation by the lapse of the time within which

by the statute they are required to make claim. Those who claim under said owners would be equally concluded.

## VI

In reference to the objection that under Article 1, Section 23, and Article 12, Section 3, the easement could not have been acquired without notice of entry to the landowner, referring to the presumptive charter right:

Clearly under the Act constituting the charter and conferring this presumptive charter right, no notice of entry is requisite and there is nothing in the Constitution which requires it.

Article 1, Section 23, of the Constitution (1868) provides that private property shall not be taken or applied for the use of the public or of corporations *without the consent of the owner,* or the payment of compensation therefor; which implies that it *may be* so taken, *with* the consent of the owner. This Court has held, as stated above, in the *Verdier case,* that the construction of a railroad upon the land of an owner in the absence of a contract, and the failure to apply for compensation within the limited time, create a presumption that the entry was made with the consent of the owner; so that the Constitution is thus complied with. The charter provides that an entry under these circumstances will presume a grant from the owner; this necessarily implies a presumption that the entry was made with the consent of the owner; so that by the ruling of this Court and by the statute contained in the charter, the Constitution has been complied with. In addition to this, the statute creates a bar to any relief from the failure of the owner to apply for compensation within the limited time.

In view of the decision in the *Verdier case* that the owner will be held under the circumstances to have consented to the taking, and of the statute which declares the presumption of a grant by the owner, it appears too plain for discussion that the provisions of the Constitution referred to by his Honor,

the circuit Judge, do not militate against the presumptive charter right. The statutory declaration of the presumption of a grant is a legislative fiat, which is at least a *prima facie* settlement of the fact, not only that the entry was made with the consent of the owner, but that he had granted the easement claimed by the railroad company. This is particularly true in the present instance, where the landowner is allowed a reasonable time, notwithstanding the presumption, to enter a claim for the assessment of the valuation and compensation.

In *Manley v. Georgia*, 279 U. S., 1, 49 S. Ct., 215, 217, 73 L. Ed., 575, decided December, 1928, the Supreme Court of the United States said:

"State legislation declaring that proof of one fact or a group of facts shall constitute *prima facie* evidence of the main or ultimate fact in issue is valid if there is a rational connection between what is proved and what is to be inferred. If the presumption is not unreasonable and is not made conclusive of the rights of the person against whom raised, it does not constitute a denial of due process of law." Citing *Mobile, etc., R. Co. v. Turnipseed*, 219 U. S., 35, 31 S. Ct., 136, 137, 55 L. Ed, 78, 32 L. R. A. (N. S.), 226, Ann Cas., 1912-A, 463, in which the Court said:

"Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of the government. Statutes, national and state, dealing with such methods of proof in both civil and criminal cases, abound, and the decisions upholding them are numerous." Citing *Adams v. New York*, 192 U. S., 585 (24 S. Ct., 372, 48 L. Ed., 575) ; *People v. Cannon* (139 N. Y., 32, 34 N. E., 759), 36 Am. St. Rep., 668; *Horne v. R. Co.*, 1 Coldw. (Tenn.), 72; *Meadowcroft v. People* (163 Ill., 56, 45 N. E., 991), 35 L. R. A., 176 (54 Am. St. Rep., 447) ; *Comm. v. Williams*, 6 Gray (Mass.), 1; State v. Thomas (144 Ala.,

77, 40 So., 271), 2 L. R. A. (N. S.), 1011 (113 Am. St. Rep., 17).

See also 2 Wig. Ev. (1st. Ed.), § 1354.

The latter part of Article 1, Section 23, and the whole of Article 12, Section 3, of the Constitution, apply solely to the mode of condemnation under the power of eminent domain, which is distinct from the other modes of acquisition.

So that the defendants are precluded from contesting the right of the plaintiff for the following reasons:

1. If any one has the right, it is the owner of the land at the time of entry.

2. The owner has lost all right which he might have had:

(a) By estoppel.

(b) By the presumption that the entry was made with his consent.

(c) By the presumption under the statute that he has granted the easement.

(d) By his failure to apply within the limited time for an assessment for compensation.

(e) By adverse possession of the railroad company.

The presumptive charter right has been sustained by this Court in numerous cases; besides those hereinbefore referred to are *Glover v. Remley,* 62 S. C., 52, 39 S. E., 780; *Atlantic Coast Line v. Searson,* 137 S. C., 486, 135 S. E., 567; *Atlantic Coast Line v. Baker,* 143 S. C., 445, 141 S. E., 688; and in North Carolina, *Beal v. R. Co.,* 136 N. C., 298, 48 S. E., 674; *S. A. L. Ry. Co. v. Olive,* 142 N. C., 257, 55 S. E., 263; *Williams v. A. C. L. Ry. Co.* (C. C. A.), 17 F. (2d), 17.

## VII

We do not think it at all material whether the proposed hard-surfaced street or road approached no nearer to the railroad track than the street or road as it had previously existed, for in any event it was impossible for the town to acquire by adverse possession or prescription a right superior to the easement vested in the railroad company.

In the recent case of *A. C. L. R. Co. v. Searson,* 137 S. C., 468, 135 S. E., 567, 573, the Court said:

" 'A right of way under charter cannot be acquired adversely to the company by prescription. The width of the strip of land necessary for railroad purposes is fixed under the authority of the state, and this fact creates a strong presumption that the whole of it should be preserved as necessary for the purposes for which it was set apart.' *Matthews v. Seaboard Air Line Ry.,* 67 S. C., 499, 46 S. E., 335, 65 L. R. A., 286.

" 'The construction and operation of one track upon its location is an assertion of its right to the entire width of its right of way. The presence of a track constantly in use is a defiant badge of ownership, and the only practical assertion of title that can be made.' Id. Jones on Easements.

" 'The construction and operation of the railroad were an assertion of right to the entire width of the right of way.' *Beck v. Northwestern R. Co.,* 105 S. C., 319, 89 S. E., 1018.

" 'The public has an interest in the construction and operation of railroads as highways which are burdened with duties to the public. Therefore a railroad company cannot dispose of or so use its right of way as to impair or destroy its ability to serve the public.' *Blume v. Southern Ry.,* 85 S. C., 440, 67 S. E., 546.

"A railroad company has some of the elements of a quasi public corporation. 'The right of way of a railroad, having been acquired for a public purpose, cannot be lost by a prescriptive use or adverse possession, unless by the erection of a permanent structure, accompanied by notice to the railroad company of an intention to claim adversely to its right.' *Atlanta & C. A. L. R. Co. v. Limestone,* 109 S. C., 444, 96 S. E., 188.

" 'According to the decisions of this Court, the owner of the fee in a railroad right of way has the right to use so much thereof as is not in the actual use and occupancy of the railroad company, provided the use be not inconsistent

with the claim of right for railroad purposes. It follows from this that a right of way of a railroad, having been acquired for a public purpose, cannot be lost by prescriptive use or adverse possession, unless by erection of a permanent structure, accompanied by notice to the railroad of an intention to claim adversely to its right.' Id."

See also *Williams v. A. C. L. R. Co.* (C. C. A.), 17 F. (2d), 17; *Sanders v. R. Co.*, 97 S. C., 423, 81 S. E., 786.

I think that the judgment of this Court should be that the decree of the circuit Court be reversed, and that the case be remanded to that Court for such further orders and proceedings as may be consistent with the conclusions herein announced.

Mr. Chief Justice Watts concurs in result.