503 S.E.2d 191

Eddie Wayne **ELDRIDGE**, Charles Louis Beaudrot, Russie Beaudrot Young, Bernard H. Padgett, Homer Charles Walker, and Ray F. Stewart, Individually and on behalf of a Class of Plaintiffs similarly situated, and Herbert Malcolm Crum, Individually and on behalf of a Class of Plaintiffs similarly situated, Plaintiffs,

v.

**CITY OF GREENWOOD**, Greenwood County, and the South Carolina Highway Department, Defendants,

Of Whom, The South Carolina Highway Department is, Appellant/Respondent,

Of Whom, The City of Greenwood is, Primary Respondent/Appellant,

Of Whom, Greenwood County is, Secondary Respondent/Appellant.

No. 2851.

Court of Appeals of South Carolina.

Heard Nov. 6, 1997.

Decided June 15, 1998.

Rehearing Denied Aug. 20, 1998.

G.P. Callison, Jr. and David M. Tatarsky, both of Callison, Darn, Thomason & Knott, Greenwood; John R. McCravy, III, of McCravy Law Firm, Greenwood; and Stephen D. Baggett, of Burns, McDonald, Bradford, Patrick & Dean, Greenwood, for appellants.

J. Kendall Few, of Few & Few, Greenville; Marvin R. Watson, of Watson Law Firm, Greenwood; and Thomas E. Hite, Jr., of Hite & Pruitt, Abbeville, for respondents.

CURETON, Judge:

This appeal concerns the property interests the Railroad[1] acquired in different segments of a rail corridor that ran through the middle of the town of Greenwood, S.C. The Railroad removed the tracks from this corridor in the 1980's as part of a project to relocate the line to the outskirts of town.

We initially address subject matter jurisdiction and conclude this action is properly before us. The other issues on appeal challenge the trial court's determination that the Railroad obtained only an easement in three segments of the rail corridor: (1) the property presumed granted to the Railroad under its charter, (2) the property obtained from the Partlow family in the 1850's through condemnation proceedings, and (3) the property acquired by deed from the Jones family in 1849.

We agree the Railroad obtained only an easement in the properties acquired by deed and by the statutory presumption of grant provisions in the Railroad's charter, but hold the Railroad had a fee simple interest in the property acquired by

---

1. The property at issue was originally acquired under various provisions of the charter of the Columbia and Greenville Railroad. Through a long series of mergers and successor corporations, the railway eventually became part of Norfolk Southern Corporation. All of these companies are collectively referred to as "the Railroad."

condemnation. We therefore affirm in part and reverse in part.

## I. FACTS

After relocation of the tracks, the Railroad quitclaimed the appropriate portions of its interest in the rail corridor to the City and County of Greenwood. The City and County then transferred their interests to the South Carolina Highway Department.[2] The Respondents, who consist of two classes of plaintiffs,[3] claim title reverted to them upon the Railroad's abandonment of the rail corridor. This court reviewed the summary judgment stage of this litigation in *Eldridge v. City of Greenwood*, 300 S.C. 369, 388 S.E.2d 247 (Ct.App.1989) (*Eldridge I*), and we refer the reader to that decision for a thorough discussion of the facts.

## II. SUBJECT MATTER JURISDICTION

Initially, we are faced with the question of subject-matter jurisdiction, which was not raised at the summary judgment stage reviewed in *Eldridge I*. Appellants contend the jurisdiction of a federal agency, the Surface Transportation Board (STB), preempts the jurisdiction of our state courts to adjudicate an action involving the abandonment of a rail line. In the alternative, Appellants contend that since Respondents did not show STB approval of the railroad's abandonment of the relevant lines, they have failed to meet their burden of proof to establish subject matter jurisdiction. We disagree.

### A. Jurisdiction of STB

■ Federal law provides that an interstate rail carrier cannot "abandon any part of its railroad lines" unless the carrier applies to and obtains approval from the STB, which must determine whether the abandonment is consistent with "present or future public convenience and necessity." These

---

2. The City of Greenwood, the County of Greenwood, and the South Carolina Highway Department are collectively designated as "Appellants."

3. The two classes of plaintiffs are those abutting property owners who are successors in title to the original landowners, and those who are heirs to the original property owners along the rail corridor.

statutes expressly state that the STB has exclusive jurisdiction over the abandonment of railroad tracks.[4] Thus, the United States Supreme Court has held that the exclusive jurisdiction of the STB[5] continues at least until an abandonment application is approved, at which time title to and disposition of former railroad property may be decided under applicable state law. *Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (jurisdiction of Interstate Commerce Commission (ICC) preempts suit against railroad for damages from abandonment); *Hayfield N. R.R. Co. v. Chicago and N.W. Transp. Co.*, 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984).

A number of state courts have held they did not have jurisdiction over property actions regarding abandonment of railroad rights of way, at least where the ICC or STB had not yet issued a certificate of abandonment. *Mobile & Gulf R.R. Co. v. Crocker*, 455 So.2d 829 (Ala.1984) (state court did not have jurisdiction to consider declaratory judgment action alleging railroad abandoned right of way); *Kansas City Area Transp. Auth. v. Ashley*, 555 S.W.2d 9 (Mo.1977) (condemnation suit barred by ICC's jurisdiction); *Trustees of the Diocese v. State*, 145 Vt. 510, 496 A.2d 151 (1985) (state court did not have jurisdiction to hear declaratory judgment action that railway easement was extinguished; even though tracks had been removed, carrier had neither sought nor received permission from the ICC to abandon).

Other states have sanctioned state court property actions involving abandoned railways. *Jordan v. Stallings*, 911 S.W.2d 653 (Mo.Ct.App.1995) (In trespass case between two landowners over former railway, state court had jurisdiction as railroad was not a party, suit did not seek to divest railroad of anything, and abandonment undoubtedly had occurred); *Missouri & Iowa Ry. Co. v. Norfolk and W. Ry. Co.*, 910 S.W.2d 261 (Mo.Ct.App.1995) (finding subject-matter jurisdic-

---

**4.** *See* 49 U.S.C. § 10501(b) ("The jurisdiction of the [STB] over ... the ... abandonment of ... tracks ..., even if the tracks are located, or intended to be located, entirely in one State, is exclusive.").

**5.** The STB took over all of the functions of the former Interstate Commerce Commission (ICC) effective January 1, 1996. 49 U.S.C. § 702. STB and ICC are used interchangeably in this opinion, depending upon the usage by the precedent being discussed.

tion for state eminent domain proceeding where state proceedings did not conflict with ICC's post-abandonment conditions); *Waldo v. Bessemer & Lake Erie R.R. Co.*, 307 Pa.Super. 56, 452 A.2d 1035 (1982) (state court had jurisdiction where lessor sought determination of abandonment and reversion, as it is not feasible for an interested party to seek ICC approval, and de facto abandonment undisputably occurred);[6] *North Carolina R.R. Co. v. City of Charlotte*, 112 N.C.App. 762, 437 S.E.2d 393 (1993) (state court had jurisdiction in dispute over property, as ICC had approved abandonment of lines), *review denied*, 336 N.C. 608, 447 S.E.2d 397 (1994), *and cert. denied*, *Norfolk S. Ry. Co. v. North Carolina R.R. Co.*, 515 U.S. 1130, 115 S.Ct. 2554, 132 L.Ed.2d 808 (1995).

### B. Waiver, De Facto Abandonment, and Mere Relocation

As a threshold matter, we agree with Appellants that the trial court erred in ruling Appellants had submitted to the jurisdiction of the court. Claims of lack of subject matter jurisdiction may be raised at any time, and subject matter jurisdiction may not be waived by filing responsive pleadings or otherwise consenting to the jurisdiction of a particular court. *Bunkum v. Manor Properties*, 321 S.C. 95, 467 S.E.2d 758 (Ct.App.1996), *cert. denied*, (S.C. Oct. 17, 1996).

We also note that although the trial court found that the last train ran over the relevant line in 1982, and the tracks were removed shortly thereafter, even a long-standing de facto abandonment is insufficient to defeat the jurisdiction of the STB to determine whether such an abandonment is within the public convenience and necessity. *See, e.g. Phillips Co. v. Denver and Rio Grande W. R.R. Co.*, 97 F.3d 1375 (10th Cir.1996) (discussing an ICC decision), *cert. denied*, *Phillips Co. v. Southern Pac. Rail Corp.*, —— U.S. ——, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997).

---

6. Interested parties other than a railroad, however, may seek "adverse" abandonment approval, even though the federal statutes do not expressly so provide. *See The Phillips Co.*, Finance Docket No. 32518, 1997 WL 78013 (S.T.B. 1997), *Kansas City Area Transp. Auth. v. Ashley*, 555 S.W.2d 9 (Mo.1977).

■ Finally, we disagree with the trial court's ruling and Respondents' contention that STB jurisdiction is not present here because this situation involves a mere relocation of a line and not an abandonment. We recognize that federal courts and the STB have ruled in a number of cases that "the [STB] will exercise jurisdiction over the abandonment or construction components of a relocation project, and require separate approval or exemption, only where the removal of track affects service to shippers or the construction of new track involves an expansion into new territory." *Missouri Pac. R.R. Co.— Abandonment Exemption,* Docket No. AB–3 (Sub–No. 90X), 1996 W.L. 583195, at *3 (S.T.B. October 10, 1996). *See also Railroad Comm'n v. Southern Pac. Co.,* 264 U.S. 331, 345–46, 44 S.Ct. 376, 68 L.Ed. 713 (1924); *Detroit/Wayne County Port Auth. v. ICC,* 59 F.3d 1314 (D.C.Cir.1995); *Boston & Albany Ry.—Abandonment,* 312 I.C.C. 458 (1961); *Missouri Pac. R.R. Co. Trustee Constr.,* 282 I.C.C. 388 (1952) (this case was limited by *City of Detroit v. Canadian Nat'l Port Auth.,* 9 I.C.C.2d 1208 (1993), *aff'd, Detroit/Wayne,* 59 F.3d 1314); *In re Application of Philadelphia, Newtown & New York R.R. Co.,* 67 I.C.C. 252 (1921).

This is known as the "relocation exception." However, the STB, which is usually given the opportunity to determine its jurisdiction, is a highly specialized agency with the expertise to decide these issues. Moreover, the record in this case simply does not set forth sufficient information for this court to determine whether the relocation exception would apply. In the STB decisions, the records obviously contained information such as the exact length of the old and proposed lines, the number of cars that passed over the area in the years prior to the relocation, the exact distance between the old and new lines, the shippers along the old and new stretches, and the exact amount of usage of the railroad by the affected shippers. This court would thus hesitate to determine, as the trial court did, that the Greenwood relocation falls within the relocation exception to the STB's jurisdiction.[7]

---

7. There is also the "multi-carrier relocation exemption." *See* 49 C.F.R. § 1180.2(d)(5). However, exemptions are "expressly available only to railroads and [are] not self-executing." *Phillips,* 97 F.3d at 1378.

## C. Actual STB Approval and Burden of Proof

■ Under the analysis of the preceding section, the contention that the jurisdiction of the STB preempts this action initially appears to have merit, if it is assumed that neither the STB nor the ICC ever approved the project. As we began to review the subject matter jurisdiction argument, however, we became concerned that the parties had no actual knowledge of whether the STB or the ICC had approved the project. Accordingly, shortly before oral argument we requested the STB furnish us with copies of any unpublished ICC orders approving abandonment and construction of tracks in the Greenwood area.

At oral argument, none of the parties objected to the court's request. Appellants then asserted that Respondents had failed to meet their burden of proof in establishing subject matter jurisdiction, although the arguments at trial, the trial court's ruling, and the Appellants' brief had all proceeded on the basis that neither the STB nor the ICC ever authorized the relocation project.

■ We reject Appellants' burden of proof argument. It is generally true that the plaintiff in an action bears the burden of proving jurisdiction when the defendant challenges it. *Cf. Brown v. Investment Management & Research, Inc.,* 323 S.C. 395, 475 S.E.2d 754 (1996) (discussing *personal* jurisdiction and the long-arm statute); Rule 8(a), SCRCP. However, while the Respondents bear the burden of proving the substantive issue of abandonment, the issue here is whether the jurisdiction of a federal agency, the STB, preempts the jurisdiction of our state courts to determine abandonment. *Cf. Hayfield,* 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527.[8]

---

8. The STB merely approves an abandonment as within the public convenience and necessity; but the STB's issuance of approval does not in and of itself consummate an abandonment, as the railroad evidently then sends a letter to the STB indicating the day on which it consummated abandonment. *Birt v. STB,* 90 F.3d 580, 586 (D.C.Cir.1996); *Fritsch v. ICC,* 59 F.3d 248, 253 (D.C.Cir.1995), *cert. denied, CSX Transp., Inc. v. Fritsch,* 516 U.S. 1171, 116 S.Ct. 1262, 134 L.Ed.2d 210 (1996). Thus, STB approval is not a necessary element of the state law issue of abandonment, although seeking and obtaining STB approval certainly can be evidence of an intention to abandon. Lack of STB approval merely preempts the ability of a state court to determine

Even though preemption involves subject matter jurisdiction, the party claiming preemption bears the burden of proving it. *See, e.g. Steele v. Collagen Corp.,* 54 Cal.App.4th 1474, 63 Cal.Rptr.2d 879 (1997); *Hernandez v. Coopervision, Inc.,* 691 So.2d 639 (Fla.Dist.Ct.App.1997); *City of New York v. Park South Assocs.,* 139 Misc.2d 997, 529 N.Y.S.2d 261 (N.Y.Sup.Ct. 1988); *Inlandboatmen's Union of the Pac. v. Department of Transp.,* 119 Wash.2d 697, 836 P.2d 823 (1992). The burden of proof for this issue thus rests upon Appellants.

While this court would not hesitate to *decline* jurisdiction based on a failure of proof, we are more careful when faced *with finding jurisdiction based on a failure of proof,* because the facts could be such that this court would lack jurisdiction. *Cf. generally State v. Keenan,* 278 S.C. 361, 296 S.E.2d 676 (1982) (stating that "every court has the power *and duty* to decide all issues necessary to the determination of its own jurisdiction" (emphasis added)). This is especially true where the determination of preemption does not depend on the application of legal standards upon which reasonable minds could differ, but depends instead upon the existence or nonexistence of an easily verifiable fact, such as whether the STB or the ICC ever approved the relocation project. Thus, we continue with the subject matter jurisdiction analysis.

### D. Public Use Conditions and Continuing STB Jurisdiction

After oral argument, the STB furnished this court copies of unpublished ICC decisions that approved all aspects of the Greenwood relocation project. *See generally Southern Railway Co. Abandonment in Greenwood County, SC,* AB–26 (Sub.–No. 13F) (ICC August 22, 1978) (issuing certificate of abandonment for the tracks that formerly ran over the stretches of land in dispute in this case, and referring to the acquisition and the trackage rights decisions). We then sent copies of those decisions to the parties and requested they respond as to the effect of those decisions on the subject matter jurisdiction issue.

---

whether a line was abandoned, and, if so, the effect of such an abandonment on title to the property.

412

■ Appellants now argue the ICC placed a "public use condition" on the property through language in the decision approving the project, and they therefore contend that "this use must be followed." They point to the following language in *Abandonment in Greenwood County*, where the ICC states:

> The proposed subject contains plans to develop the right-of-way to be abandoned into a landscaped open space. Since this part of the project is covered in formal agreements among the participants in the project (including Southern), a public use condition will not be necessary.

AB–26 (Sub–No. 13F) at 2. In its findings, the decision further states: "This property is suitable for other public purposes." *Id.*

We disagree that state court action is somehow restricted by the above-quoted language. The authority to impose public use conditions is found in 49 U.S.C.A. § 10905, which provides as follows:

> When the Board approves an application to abandon or discontinue under section 10903, the Board shall find whether the rail properties that are involved in the proposed abandonment or discontinuance are appropriate for use for public purposes, including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation. If the Board finds that the rail properties proposed to be abandoned are appropriate for public purposes and not required for continued rail operations, the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the Board. The conditions may include a prohibition on any such disposal for a period of not more than 180 days after the effective date of the order, unless the properties have first been offered, on reasonable terms, for sale for public purposes.

Therefore, a public use condition can arise only if the STB finds the property is suitable for other public purposes. If the STB does so find, then it can (1) impose conditions on the sale, lease, exchange, or disposal of the property, and (2) prevent "disposal" for no longer than 180 days, or until the properties have been offered for sale for public purposes.

For whatever reason, the ICC expressly did not impose any public use condition. The ICC's finding that property is suitable for public purposes is only the necessary prerequisite to actual imposition of a public use condition, but such a finding by itself does not amount to the imposition of one. *Cf. Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308, 1316 (1986).

Appellants contend, however, that the ICC implicitly placed a public use restriction on the abandonment through the language quoted above from *Abandonment in Greenwood County*. We disagree the ICC's abandonment decision somehow affects this court's jurisdiction.

 Despite the mandatory sound of "public use condition," the term does not mean that the former rail line property must be sold and used for some stated public purpose. A public use condition normally refers to a "waiting period" in the form of a 180–day prohibition on the railroad's "disposal" of the property, which allows for a potential sale to an entity that will use the property for public purposes. *Birt v. STB*, 90 F.3d 580, 587 n. 14 (D.C.Cir.1996); *Fritsch v. ICC*, 59 F.3d 248, 249 (D.C.Cir.1995), *cert. denied, CSX Transp., Inc. v. Fritsch*, 516 U.S. 1171, 116 S.Ct. 1262, 134 L.Ed.2d 210 (1996). A public use condition does not stay abandonment; it merely stays disposal, and § 10905 does not give the ICC power to require a sale for public purposes, or to otherwise "impose terms or conditions of sale." *Connecticut Trust for Historic Preservation v. ICC*, 841 F.2d 479 (2d Cir.1988) (concluding that "the ICC's view that it lacks power to require sale or impose terms and conditions of sale is accordingly a reasonable and permissible interpretation of [§ 10905] and we see no reason to disturb it"); *Lawson*, 730 P.2d at 1316–17 (citing *Burlington Northern, Inc.—Abandonment*, 342 ICC 446 (1972), for the proposition that § 10905 does not authorize the ICC to require a railroad to donate a right of way for a public purpose). *See also Birt*, 90 F.3d at 588 (citing *Fritsch* and stating, "while [§ 10905] stays a railroad's authority to sell, lease, exchange, or otherwise dispose of the right-of-way, it does not stay abandonment"); *Fritsch*, 59 F.3d at 252 (noting, "Nothing in this language [of § 10905], explicitly or implicitly, refers to the staying of an abandonment during the 180–day period").

414

There is thus no requirement that the property actually be used for public purposes if no entity is willing to buy or lease the property for public purposes. Moreover, absent a Trails Act issue, discussed below, a public use condition does not affect real property issues if the railroad owned only an easement interest in the property, as such an interest would automatically terminate upon abandonment. *Fritsch*, 59 F.3d at 252–53 (Regardless of a 180–day public use condition, "once a railroad consummates abandonment of a bare easement, the railroad no longer possesses any property interests to transfer.... [Easement] interests were thus extinguished as a matter of law. Certainly neither [§ 10905] nor the Trails Act can create a new property interest if abandonment has already occurred.").

■ The ICC obviously referred to the 180–day waiting period in the above-quoted passage from *Abandonment in Greenwood County*. Since an agreement to dispose of the property for public uses *already existed*, there was no need to require a waiting period before disposal in order to give interested entities the opportunity to obtain the property for those uses. The ICC's jurisdiction therefore terminated upon issuance of the certificate of abandonment, and resolution of what interests the agreements and conveyances transferred is a matter for state law.

### E. *Preseault* and the Trails Act

Appellants next rely on *Preseault v. ICC*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), and assert that any taking of reversionary interests by the ICC's decision is a matter for federal and not state jurisdiction. We disagree.

*Preseault* addressed a claim that reversionary interests in a rail bed were unconstitutionally "taken" by conversion from rail use to interim recreational trail use pursuant to the Trails Act, 16 U.S.C. §§ 1241–1262. Since the gradual decline of rail trackage in the country had led to "the Hobson's choice of forfeiting a national rail system through piecemeal abandonment of lines, or forcing railroads to maintain tracks on which they cannot turn a profit," Congress sought to provide a third option. *Birt*, 90 F.3d at 582. Congress's 1976 enactment of the provision authorizing the ICC to issue the 180–day prohi-

bition, discussed above, on disposal of abandoned rail proper-
ties was part of the initial attempt to address this problem.
*Preseault,* 494 U.S. at 6, 110 S.Ct. 914 (discussing what is now
12 U.S.C. § 10905).

Upon recognizing that the initial measures had not
succeeded in establishing a process for conversion from "rails
to trails," in 1983 Congress enacted the relevant provisions of
the Trails Act. *Preseault,* 494 U.S. at 6–7, 110 S.Ct. 914.
These amendments provide a process through which a willing
railroad and a willing state or private entity may agree for the
rail line at issue to be transferred to the entity for interim
trail use. *Id.* (discussing 16 U.S.C. § 1247(d) and 49 C.F.R.
§ 1152.29 (1996)). The Trails Act does not empower the STB
to order trail use in the absence of agreement between both a
willing railroad and an entity willing to assume managerial
and financial responsibility for the property. *Connecticut
Trust,* 841 F.2d at 482. *See also Nebraska Trails Council v.
STB,* 120 F.3d 901, 904 (8th Cir.1997). The 1983 Amendments
to the Trails Act, however, expressly provide that "such
interim [trail] use shall not be treated, for purposes of any law
or rule of law, as an abandonment of the use of such rights-of-
way for railroad purposes." 16 U.S.C. § 1247(d). *Cf. also*
S.C.Code Ann. § 57–3–40 (Supp.1997) (containing similar pro-
vision in powers of Division of Mass Transit). This provision
was enacted to address the problem of "state property laws
which prescribed that once rail service is discontinued after
the ICC's approval of abandonment, ... easements would
automatically expire and the rights of way would revert."
*Grantwood Village v. Missouri Pac. R.R. Co.,* 95 F.3d 654, 658
(8th Cir.1996). Thus, under the Trails Act, a conversion is
treated as a mere discontinuance, and not as an abandonment.
*Grantwood Village,* 95 F.3d at 658.[9] In addressing this pro-
cess, the Supreme Court concluded in *Preseault* that "even if
the rails-to-trails statute gives rise to a taking [of reversionary
property interests], compensation is available to [interest hold-

---

9. In fact, if the railroad consummates an approved abandonment dur-
ing a time when none of the Trails Act process is in effect, then the STB
loses jurisdiction, and § 1247(d) cannot prevent reversion if the rail-
road held only an easement in the property. *See Fritsch,* 59 F.3d at
252–53. *See also Becker v. STB,* 132 F.3d 60 (D.C.Cir.1997); *Birt,* 90
F.3d at 585.

ers] under the Tucker Act, 28 U.S.C. § 1491(a)(1)." 494 U.S. at 4, 110 S.Ct. 914.

Neither the record before us nor the ICC decisions affecting this property mention any Trails Act issues. The relevant portions of the Trails Act were not enacted until March 1983. The ICC approved abandonment of the lines at issue here in 1978, and the trial judge found that the rails were removed between November 1982 and July 1983. Since no Trails Act conversion occurred, *Preseault* does not require the Respondents to seek compensation under federal law.

## III. SCOPE OF REVIEW

Turning next to the substantive issues before us, we begin by defining the appropriate scope of review. The nature of the underlying issue determines whether a suit for declaratory judgment is legal or equitable. *Felts v. Richland County*, 303 S.C. 354, 400 S.E.2d 781 (1991). While an action to quiet title is usually one in equity, the main purpose of the complaint determines the character of the action. *Clark v. Hargrave*, 323 S.C. 84, 473 S.E.2d 474 (Ct.App.1996). The dispositive question in this case concerns the determination of title to real property, which is a legal issue. *Wigfall v. Fobbs*, 295 S.C. 59, 367 S.E.2d 156 (1988); *Cook v. Eller*, 298 S.C. 395, 380 S.E.2d 853 (Ct.App.1989). Moreover, while the scope or extent of an easement is a question in equity, the existence of an easement is a factual question in an action at law. *Slear v. Hanna*, 329 S.C. 407, 496 S.E.2d 633 (1998); *Smith v. Commissioners of Public Works*, 312 S.C. 460, 441 S.E.2d 331 (Ct.App.1994).

It follows that termination of an easement by abandonment is a factual question in an action at law as well. *See Southern Ry. v. Howell*, 89 S.C. 391, 71 S.E. 972 (1911). In a law case tried by the judge without a jury, this court reviews for errors of law and reviews factual findings only for evidence which reasonably supports the court's findings. *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976). However, the interpretation of a deed is an equitable matter. *Heritage Fed. Sav. & Loan v. Eagle Lake & Golf Condominiums*, 318 S.C. 535, 458 S.E.2d 561 (Ct.App. 1995). Finally, the interpretation of a statute is a matter of

law. *Charleston County Parks & Recreation Comm'n v. Somers,* 319 S.C. 65, 459 S.E.2d 841 (1995). We will apply the appropriate standard of review for a particular issue in a case that contains both legal and equitable issues. *See Floyd v. Floyd,* 306 S.C. 376, 412 S.E.2d 397 (1991); *Smith v. Commissioners of Public Works,* 312 S.C. 460, 441 S.E.2d 331 (Ct.App. 1994).

## IV. TITLE BY STATUTORY PRESUMPTION OF GRANT

 Regarding property along the right of way that the Railroad obtained by statutory presumption of grant, the Appellants contend that conversion from railroad use to public roadway use does not extinguish the easement. We disagree.

Act No. 2953, 1845 *S.C. Acts* 324 ("The Act of 1845"), created the Greenville and Columbia Railroad Company and provided for its powers to obtain and hold property. Section XI of this Act provides for a statutory presumption of grant in certain instances:

> That in the absence of any written contract between the said Company and the owner or owners of land, through which the said Railroad may be constructed, in relation to said land, it shall be presumed that the land upon which the said Railroad may be constructed, together with one hundred feet on each side of the centre of said road, has been granted to the said Company by the owner or owners thereof, and *the said Company shall have good right and title to the same, . . . so long as the same may be used only for the purposes of the said railroad and no longer,* unless the person . . . to whom any right or title to such lands . . . descend or come, shall prosecute the same within two years next after the construction of . . . said road . . ., and if any person . . . [does] not prosecute the same within two years next . . . then he . . . shall be forever barred to recover the same.

1845 *S.C. Acts* 327–28 (Emphasis added).

Ample South Carolina Supreme Court precedent has defined the Railroad's interest in Section XI property as an easement only. *See Eldridge I,* 300 S.C. at 373 n. 1, 388 S.E.2d at 249 n. 1 (citing *Ragsdale v. Southern Ry. Co.,* 60

S.C. 381, 38 S.E. 609 (1901), and *Southern Ry. v. Beaudrot,* 63 S.C. 266, 41 S.E. 299 (1902) ("Having a mere easement in the land, [the Railroad's] right of possession is not exclusive...."). *See also Boney v. Cornwell,* 117 S.C. 426, 109 S.E. 271 (1921). *Cf. Lorick & Lowrance v. Southern Ry. Co.,* 87 S.C. 71, 68 S.E. 931 (1910).

The Appellants argue that use of the old railway for public highway purposes is consistent with the railroad's easement, as the conversion from railways to highways for automobiles has been a "natural progression" resulting from technological and social changes over the last 150 years.[10] This argument is often called the "shifting public uses" doctrine. It "provides that the progression from the public use for which an easement is originally granted to another public use will not constitute an abandonment of the easement, so long as the new use is deemed permissible by the courts." *Preseault v. United States,* 100 F.3d 1525, 1559 (Fed.Cir.1996) (Clevenger, J. dissenting). In support of the view that "shifting public uses" do not affect an easement's survival, the Appellants cite *Louisville, Cincinnati and Charleston R.R. Co. v. Chappell,* 24 S.C.L. (Rice) 383, 388–389 (1838), which agreed with the trial court's reasoning that a railroad "is not less a highway," and is similar to turnpikes, ferries, and public bridges, in that "[a]ll these are public roads, or parts of roads." In *City of Columbia v. Tatum,* 174 S.C. 366, 177 S.E. 541 (1934), the court rejected a claim that a utility could not perform its public transportation duties by upgrading from electric streetcars to buses. The court stated: "The utilities are merely changing the instrumentalities used in performing their charter duties to furnish transportation. The language of the statute should be construed from a modern standpoint, and not to prohibit

---

**10.** In *Eldridge I* we addressed the trial court's summary judgment ruling that the railroad was still using the right of way for railroad purposes, because the trade for new property allowed the railroad to serve the public in a more efficient manner. 300 S.C. at 374, 388 S.E.2d at 249. *Eldridge I* also rejected the claim that § XXIV of the Act of 1845 "allowed the use of the vacated right-of-way for highway purposes." 300 S.C. at 379, 388 S.E.2d at 252. The issue now is slightly different; the question here is whether technological and social changes over time have created such "shifting public uses" as to allow use of the railroad's right of way for a public highway, which admittedly has nothing to do with railroad purposes.

progress in the public interest." 174 S.C. at 386, 177 S.E. at 549. Moreover, in *Leppard v. Central Carolina Telephone Co.*, 205 S.C. 1, 4, 30 S.E.2d 755, 756 (1944), the court, in approving the placement of telephone poles and wires along a city street without compensation to the adjoining landowners, stated: "When new modes of travel and new means of communication become necessary, the public have a right to use them, and they impose no new burden on the soil unless they are inconsistent with the old use." The *Leppard* court concluded:

> [W]e are of the opinion that the grant or a condemnation of a public street or highway must be presumed to have been made not for such purposes and usages only as were known to the landowner at the time of the grant, but for all public purposes, present and prospective, consistent with its character as a public highway, and not actually detrimental to the abutting real estate.

205 S.C. at 8, 30 S.E.2d at 757.

The Appellants also cite a number of cases from other jurisdictions that have approved substitution of transportation as consistent with the public benefit for which the easement was originally given. *See Faus v. City of Los Angeles,* 67 Cal.2d 350, 62 Cal.Rptr. 193, 200 n. 8, 431 P.2d 849, 856 n. 8 (1967) (conversion of easement for municipal railway system to roadway for public bus service did not result in abandonment, even though title was taken by city from railroad, as "the original grants were made with the intent of benefiting the public by assuring transportation service . . . and the city, along with the transit authority, has now assumed the responsibility of carrying out that purpose"); *Fox v. Ohio Valley Gas Corp.,* 250 Ind. 111, 235 N.E.2d 168 (1968) (placement of gas pipeline along public street was not additional burden on servient estates of abutting landowners); *State by Washington Wildlife Preservation, Inc. v. State,* 329 N.W.2d 543 (Minn. 1983) (conversion of railroad right of way to public recreational trail did not operate to abandon easement, as right of way had never been abandoned for purposes of public travel, and trail use was not an added burden on servient estate); *Bernards v. Link,* 199 Or. 579, 248 P.2d 341 (1952) (conversion of logging railway to road for logging trucks was not abandonment of easement, as conversion to trucks was not an in-

creased burden, but the product of technological evolution), *aff'd on reh'g*, 199 Or. 579, 263 P.2d 794 (1953).

On the other hand, courts have also held that the change in use of a right of way from a railway to a public recreational trail extinguished the easement. *See, e.g. King County v. Squire Inv. Co.*, 59 Wash.App. 888, 801 P.2d 1022, 1025 (1990) (citing *Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308, 1313 (1986)), *review denied*, 116 Wash.2d 1021, 811 P.2d 219 (1991).[11] *See also The Chevy Chase Land Co. v. United States*, 37 Fed.Cl. 545 (Fed.Cl.1997) (addressing whether there was a taking by the Trails Act, and concluding under Maryland law that if it is assumed the railroad had only an easement, conversion from rails to trails would amount to abandonment). We recognize, of course, the obvious difference between conversion to a mere recreational trail and conversion to a general purpose public roadway.

Despite the language in *Chappell, Leppard, Tatum,* and other cases cited by Appellants, we hold that the doctrine of "shifting public uses" does not preclude a finding of abandonment in this case.

Even if we assume the Railroad did not abandon its easement prior to execution of the quitclaim deeds, we still reject the "substitution of transportation" argument and conclude the easement was extinguished. The railroad derived its interest to the rights of way pursuant to a statutory provision. The words of a statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand a statute's operation. *Wortman v. City of Spartanburg*, 310 S.C. 1, 425 S.E.2d 18 (1992). It is also a general rule of construction that statutory grants of eminent domain should be strictly construed. *Cf. Greenwood County v. Watkins*, 196 S.C. 51, 12 S.E.2d 545 (1940) (citing *Leitzsey v. Columbia Water–Power Co.*, 47 S.C. 464, 25 S.E. 744 (1896)).[12] Section XI of the Act of 1845 unequivocally

---

11. Evidently, there was no Trails Act conversion in either of the two cases.

12. The statutory presumption of grant is part of the condemnation power. In effect, such a statutory provision acts as a two-year "statute of limitations" on the right of an affected landowner to seek compensation for condemnation.

states that the railroad "shall have good right and title to [land presumed granted], so long as the same may be used *only for the purposes of the said railroad and no longer*." (Emphasis added).

We hold, as we did in addressing the similar but distinct arguments in *Eldridge I*, that the emphasized language means exactly what it says, and only railroad uses are permitted. *See Lorick*, 87 S.C. 71, 68 S.E. 931 (use for nonrailroad purposes, or nonuse with intent to abandon, extinguishes right of way acquired under statutory presumption of grant). *Cf. McKinley v. Waterloo R.R. Co.*, 368 N.W.2d 131 (Iowa 1985) (shift of mode of transportation not permissible under easement, as easement was only for railroad purposes, and interest was created by condemnation statute, not deed). Such a strict but literal interpretation of the preceding language seems even more appropriate and consonant with legislative intent in a case such as this, where the property at issue was taken by mere presumption of grant, without compensation to the original private landowners.

In any event, we do not believe the "shifting public uses" doctrine applies to the facts here. Unlike the cited cases, where there was a technological development which simply did not exist at the time of the grant, and therefore could not have been within the express contemplation of the actors, public highways and railroads both existed as separate modes of travel at the time of this presumed grant of an easement. Today, although the use of railways has declined in this country, they remain a viable mode of transportation. While the argument certainly is appealing that a roadway is consistent with the public transportation use behind a railroad easement, and no more of a burden on the servient estate, we do not see a technological progression from railroads to roadways. Rather, we see two separate and distinct classes of transportation which were viable then, and which remain so today.[13] For this reason, the supposed shift from railways to

13. We also reach this conclusion because we consider public railroads and modern public highways insufficiently analogous to be considered essentially the same use for purposes of an easement. We certainly agree that railroads and highways are both public roads, as noted in *Chappell*. Railroads, however, differ vastly from modern highways on

roadways certainly differs from the permissible shifts from horse and carriage to "horseless carriages," or from streetcars to "trackless trolleys." Further, courts have held that the converse of the claimed shift here is not permissible; thus, one may not construct a railroad on a right of way given for public highway purposes. *Coon v. Sonoma Magnesite Co.*, 182 Cal. 597, 189 P. 271, 272 (1920) ("[A]n easement for a wagon road would not justify the construction of a railroad along such strip."). *Cf. Williams v. Bruton*, 121 S.C. 30, 113 S.E. 319 (1922) (holding that easement of access for "teams" did not include the right to build a railway, and relying in part on the different risks associated with a railroad). We therefore do not think, under the facts of this case, that there has been such a shift away from railroads that we could ignore cases such as *Lorick* and permit the assignee of an easement, given by statute expressly for one class of transportation, to switch at will to another separate and distinct class of transportation. To hold otherwise would effectively gut the longstanding rule that an easement is extinguished upon the railroad's abandonment of the right of way for railway purposes.

We affirm the trial court's ruling that the Railroad's abandonment by January 1984 extinguished the easements acquired by statutory presumption of grant.[14]

## V. TITLE BY CONDEMNATION—PARTLOW TRACT

The Appellants next contend that the Railroad acquired fee simple title to the land condemned from the Part-

---

issues such as construction, maintenance, traffic, pollution, nuisance, danger, and, primarily, access and use.

**14.** The trial court's order stated that the testimony reflected the tracks were removed by July 1983. However, the witness later testified that "the tracks were removed between '83 and '85," and that they were definitely gone by May 1985. In its conclusions of law, the trial court stated that the Railroad's easement was extinguished upon "removal of its tracks and conveyance of its former easement to the City, County, and Highway Department." However, the court then noted that "the time of abandonment of the Railroad right-of-way [was] in January of 1985." The Railroad quitclaimed any interest it had in the right of way to the City and County of Greenwood in January 1984, and the City and County quitclaimed their interest to the South Carolina Department of Highways and Public Transportation in January 1985. Therefore, it would appear that the Railroad abandoned the property at least by January of 1984.

lows pursuant to Section X of the Act of 1845. They argue a letter from the Railroad's tax agent should have been excluded, and they rely on the express "fee simple" language of Section X, which sets forth a condemnation procedure. We hold the Railroad obtained a fee simple absolute in the Partlow property.

Section X of the Act of 1845 provides:

That in any case where *lands or private rights of way* may be required by the said Company for the purposes aforesaid, and the same cannot be purchased from the owner or owners for want of agreement of the parties as to price or from any other cause, the same may be taken by the Company at a valuation to be made by Commissioners. . . . In making the said valuation the said Commissioners shall take into consideration the loss or damage which may occur to the owner or owners *in consequence of the land or the right of way being taken;* and also the benefit or advantage he, she, or they may receive from the establishment or erection of the Railroad and works. . . . Either party to the proceeding may appeal from the said valuation to the next session of the Court granting the Commission, giving reasonable notice to the opposite party of such appeal, and the Court upon satisfactory proof that the appellant has been injured by such valuation shall order a new valuation, to be made by a jury, . . . and their verdict shall be final and conclusive between the parties, unless a new trial be granted; and the lands and right of way so valued by the Commissioners or Jury *shall vest in the said Company in fee simple,* so soon as the valuation thereof may be paid, or tendered and refused. . . . In all assessments made by the Commissioners or Jury as aforesaid, after the construction of the road or of the part thereof upon the land to be valued, reference shall be had to the true value of the land at the time of the erection of the said road or part thereof, and *the use thereof by the said Company for the purposes of said road* shall be considered as an actual possession of said land covered by said road, and the space of one hundred feet on both sides of said road as aforesaid.

1845 *S.C.Acts* 324, 326–27 (Emphasis added).

The above-quoted provision would allow the Railroad to condemn a fee simple absolute in property for which the

Railroad paid compensation pursuant to the procedure. In *Lewis v. Wilmington & Manchester R.R. Co.*, 45 S.C.L. (11 Rich.) 91, 95 (1857), Justice Wardlaw in dissent discussed a nearly identical charter and distinguished between the statutory presumption of grant and the condemnation procedure:

> [I]f [the landowner] should permit the railroad Company to hold, without complaint, until the expiration of [the statutorily defined time period] from the time the road was there finished, the land would become subject to the Company's right to enjoy the slip occupied by them, so long as they continued to use it for their road, and no longer: —but if compensation should be claimed and paid, *the fee simple absolute would thereby be vested in the company.* (Emphasis added).

*See also Ragsdale v. Southern Ry. Co.*, 60 S.C. 381, 38 S.E. 609 (1901) *and Waring v. Cheraw & Darlington R.R. Co.*, 16 S.C. 416 (1882) (both quoting with approval Justice Wardlaw's statement in *Lewis* ).

Moreover, we read the language in the last sentence of the above-quoted portion of Section X, which states that "the use thereof by the said Company for the purposes of said road shall be considered as an actual possession," as merely instructive on the issue of valuation, and not as a limitation on the nature of the interest the railroad could condemn. *Cf. Cain v. South Carolina Pub. Serv. Auth.*, 222 S.C. 200, 72 S.E.2d 177 (1952) (power to condemn in fee simple for hydroelectric project was expressly limited by "right to repurchase" upon the existence of stated conditions). To hold otherwise from that sentence would conflict with Justice Wardlaw's conclusion that a fee simple absolute results after successful completion of the condemnation procedure.

▮ The trial judge correctly recognized that simply because the railroad could condemn an interest in fee simple absolute does not necessarily mean that the railroad sought and obtained a fee in a particular condemnation proceeding. In *Charleston & Savannah R.R. Co. v. Blake*, 46 S.C.L. (12 Rich.) 634 (1860), the court discussed by analogy the 1849 amendments to the Act of 1845. These amendments provide that "in no case shall [the Railroad] be compelled, under the ninth, tenth and eleventh sections of the Act [of 1845], to take

an assessment and valuation of one hundred feet on each side of their railway; but that they may take any less quantity of the land of any owner which may be necessary." Act No. 3073, 1849 *S.C.Acts* 575, 576. In response to the trial judge's instruction that the landowner could reject a railroad's offer by insisting that it take a fee simple absolute in the land for the railway, the court addressed charter sections similar to Sections IX and X of the Act of 1845 and concluded: "The right to take the fee involves the right to take a less estate, or to take on any terms or conditions the company may propose." *Blake*, 46 S.C.L. (12 Rich.) at 652. *See also Kunkle v. South Carolina Elec. & Gas Co.*, 251 S.C. 138, 146, 161 S.E.2d 163, 165 (1968) ("Statutes authorizing the acquisition of a fee simple title by condemnation do not mean that in every instance of the exercise of such power the fee is acquired.... [W]here the authority is granted to condemn the fee, whether the fee is condemned, or some less estate, is optional and rests within the [appropriately exercised] discretion of the condemnor....").

We must therefore review the trial court's conclusion that the Railroad condemned only an easement in the Partlow property, or if not an easement, then a fee simple determinable. The trial court first noted that the Partlows were no friends of the Railroad, and litigation from the feud between the two over the railway's passage through the Partlow estate resulted in three published opinions. *See Greenville & Columbia R.R. Co. v. Partlow*, 39 S.C.L. (5 Rich.) 428 (1852) (*Partlow I* ) (reversing for a new trial the jury's valuation of William Partlow's property condemned by Railroad, because of aspects of the judge's charge on valuation); *Greenville & Columbia R.R. Co. v. Partlow*, 40 S.C.L. (6 Rich.) 286 (1853) (*Partlow II* ) (ruling, on appeal from the remand in *Partlow I*, that neither party was entitled to costs incurred from the condemnation procedure); *Greenville & Columbia R.R. Co. v. Partlow*, 48 S.C.L. (14 Rich.) 237 (1867) (*Partlow III* ) (dismissing motion in arrest of judgment and motion for new trial, in John Partlow's appeal from jury verdict in favor of Railroad, for an 1864 incident when Partlow caused derailment of a train by ordering slaves to pull up the rails). In reviewing these decisions, the trial court concluded: "[T]he precise title

sought by the Railroad in the *Partlow* proceedings is not specifically revealed in the [three decisions]."

We believe that the only interpretation from the language in the decisions is that the Railroad sought and ultimately obtained a fee simple absolute through the Section X condemnation procedure. In *Partlow I*, the circuit judge's "report" begins by stating: "The commissioners had assessed against [the Railroad] the value of one hundred feet of *land*, on each side of the [center of the] road, ... amounting to forty acres." 39 S.C.L. (5 Rich.) at 429 (emphasis added). The "report" then describes negotiations by which Partlow initially agreed but ultimately refused to give the Railroad a "right of way." *Id.* at 429–31. The "report" then continues: "The defendant having sold the land as far as a line extending along the road at the distance of twenty-five feet from its centre, the jury [was] directed to appraise only ten acres, instead of forty." *Id.* at 433. Discussing proper valuation of the condemned rail corridor, the opinion states: "The loss and damage of the defendant is the value of *the land* the [Railroad] has taken and the injury which the location and use of the road, through his tract, may cause to the remainder." (Emphasis added). *Id.* at 437. While the *Partlow I* court quotes Section X where it refers to "lands or rights of way," the "report" and the opinion's discussion mentions "lands" only when addressing Partlow's case. *But see Kunkle*, 251 S.C. at 148, 161 S.E.2d at 166 ("The word 'land' may include any estate or interest in land; and may mean an easement as distinguished from the fee, if such is consistent with the intent of the parties."). Tellingly, the "report" does use the term "right of way" solely when discussing the initial negotiations between Partlow and the Railroad.

In *Partlow II*, the court repeatedly referred to the "fee simple" language of Section X in its discussion of whether costs were taxable under the condemnation procedure. 40 S.C.L. (6 Rich.) at 287–98. For example, the court noted, "[T]he [railroad company's] performance of this obligation [to pay compensation] is a condition precedent to its acquiring a fee simple in the land, so that the land and the improvements that may be made on it are virtually mortgaged to secure the performance." *Id.* at 289. The court then distinguished the charter provisions resulting in a statutory presumption of

grant: "Taking and occupation [by the railroad] for two years ... raise, however, without payment [or] ... a written contract, the presumption of a grant ... to continue so long as that land may be used for the purposes of the road." *Id.* In discussing the issue of whether costs may be recovered in the condemnation procedure, the court noted that "the payment ... of the valuation [from the condemnation procedure] ... precede[s] the perfection of title in the [railroad] company ." *Id.* at 297. *Cf. Black's Law Dictionary* 509, 1485 (6th ed. 1990) (An "easement" is "a right of use over the property of another," while "title" is "the formal right of ownership of property."). While admittedly these statements were made in a general discussion of the statutory provisions, the court did not mention rights of way or easements in *Partlow II.*

Finally, in an action of trespass *quare clausum fregit* in *Partlow III,* the Railroad alleged that John Partlow ordered slaves to pull up rails. Partlow appealed the verdict against him, and the supreme court affirmed. The circuit judge's "report" noted: "[Partlow] was the proprietor of the land on both sides of the road where the trespass was committed." 14 Rich. (48 S.C.L.) at 240.

We think the only inference from *Partlow I* and *II* is that the Railroad sought to acquire a fee simple interest in the land. We see no reason why *Partlow I* would discuss issues of valuation and not mention that the railroad sought only an easement. *Cf. Kunkle,* 251 S.C. at 148, 161 S.E.2d at 166 (noting, while discussing whether an easement or fee simple interest was condemned, that the "present record contains no showing as to whether the amount paid to the landowner ... represented the then market value of the entire interest in the tract"). We further see no reason why the court in *Partlow II* would continually refer to the "fee simple" aspect of the Section X condemnation procedure, but never note that the Railroad was merely condemning an easement. In other cases from this time period, the court also refers to the railroad's ownership of Section X land ownership in fee simple. *See Gillison v. Savannah & C.R. Co.,* 7 S.C. 173, 180–81 (1876) (After railroad failed to pay the condemnation assessment from 1860, former landowners brought suit, and the court, after noting the "fee simple" language in the condemnation charter provision, stated that the interest of the Railroad was

"that of purchasers under a contract [arising by operation of law] for the sale of the land." The court then noted: "The land was subject to being treated in equity as if mortgaged to the [former landowners] as a security for so much money as they ought to receive in compensation for the value of the land."); *Lewis,* 45 S.C.L. (11 Rich.) at 94 (stating that "the land or right of way is vested in the [railroad] Company in fee simple as soon as the valuation is paid, or is refused when tendered").

The General Assembly, however, essentially ended a railroad's ability to condemn an unfettered fee simple interest by its passage of the Condemnation Act of 1868. This Act applied "whenever any person or corporation shall be authorized by charter to construct a railway, canal, turnpike, or other public highway in this State." Act No. 42, § I, 1868 *S.C.Acts* 88. Unlike the "fee simple" language in the condemnation sections of the prior railroad charters, this statute specifically provided:

> That upon payment of the compensation thus ascertained by a jury, the right of way over said lands, or *the use of said lands for the purposes for which the same were required,* shall vest in the person or corporation who shall hold the charter of such highway, so long as the same shall be used for such highway, and no longer; *but the fee in such lands subject to such special uses shall remain in the owner* thereof, and nothing herein contained shall be construed to confer upon such person or corporation any right in, or power over, the lands so condemned, other than such as may be within the particular purpose for which such lands are condemned.

Act No. 42, § VII, 1868 *S.C.Acts* at 90 (emphasis added).

In the dissenting opinion in *Carolina & N.W. Ry. Co. v. Alexander,* 155 S.C. 91, 112, 151 S.E. 893, 900 (1929), Justice Cothran stated: "It appears that prior to the condemnation statute of 1868, there was no *general law* prescribing the manner in which a right of way for a railroad might be condemned; it seems to have been regulated by the provisions of the several charters of the railroad companies." (Emphasis in original).[15] *See also McCrea v. Port Royal R.R. Co.,* 3 S.C.

---

15. The majority in *Alexander* noted that the South Carolina Constitution of 1868 provided private property would not be taken for public use

381, 383 (1872) ("The Act of 1868 did not impair the obligation of any [of the railroad's] contract[s]. At the date of its passage, no right to the land in question had vested in the company. It declared a general law upon the subject....").

In contrast to earlier cases, the courts express the railroad's interest as only an easement in cases discussing railroad condemnation that occurred after passage of the Condemnation Act of 1868. *See Charleston & W.C. Ry. Co. v. Reynolds*, 69 S.C. 481, 509, 48 S.E. 476, 485 (1904) (In a case involving track completed in 1884, the court stated: "Railways do not obtain fee simple title to land under condemnation proceedings."); *Miller v. Seaboard Air Line Ry.*, 94 S.C. 105, 108, 77 S.E. 748, 749 (1913) (stating: "In this case the land was 'condemned.' The condemnation statutes provide only for the taking of a right of way.... The plaintiff still retained ownership of the land...."). *Cf. Lorick*, 87 S.C. 71, 68 S.E. 931 (noting that the "for purposes of said road and no longer" language in the statutory presumption of grant section of a pre–1868 charter was essentially identical to the language in the Condemnation Act of 1868, and thus a right of way acquired under such a charter could be abandoned by use for non-railroad purposes, or by nonuse indicating an intention to abandon).

A review of the law's development through this period makes clear that the absence of any mention in *Partlow I* and *II* that the Railroad was seeking merely an easement, coupled with the court's repeated statements that railroads obtain fee simple title to tracts obtained by Section X's condemnation procedure, can only mean that the railroad was seeking what

---

without just compensation and ruled the constitutional and statutory condemnation provisions enacted in 1868 essentially abrogated the statutory presumption of grant procedure found in the various railroad charters. 155 S.C. at 93–97, 151 S.E. at 894–96. *See also McCrea v. Port Royal R.R. Co.*, 3 S.C. 381 (1872) (Act of 1868 overrode the railroad's 1857 charter, despite charter's renewal in 1870; the court considered the charter to be amended to conform to the then-existing law). The dissent in *Alexander* argued that the 1868 condemnation provisions affected only the condemnation mode of acquisition, and not any other mode of acquisition, such as the statutory presumption of grant procedure found in the railroad's charter. 155 S.C. at 113–16, 151 S.E. at 900–901.

was essentially the default under the charter provisions: a fee simple absolute interest.

██ Nonetheless, the trial court found that "there is evidence ... the Railroad acquired an easement only." First, the court noted that "the plats of the Railroad showing both the statutory presumption of grant section of its right of way and the Partlow portions [make] no distinction between the two." These detailed plats show a solid line drawn on either side of the drawing of the railway, and this line is periodically designated by an arrow drawn to the words "right of way line." While the solid line reflects the difference in width of the railroad's interest between the Partlow and the statutory presumption of grant segments, the designation does not change.

"Right of way" is "a right ... to pass over the land of another, but it is also used to describe that strip of land upon which railroad companies construct their road bed, and, when so used, the term refers to the land itself, not the right of passage over it." *Black's Law Dictionary* 1326 (6th ed. 1990).[16] *See also Brown v. State*, 130 Wash.2d 430, 924 P.2d 908 (1996). We think the only possible inference is that use of the words "right of way line" in the plats merely refers to the latter definition, that of the rail corridor, and was not in any way intended to reflect the nature of the railroad's property interest in any given segment.

██ Next, the trial court admitted over objection a letter dated May 18, 1983, from "J.E. Hawkins," who signed the letter as General Tax Agent for Norfolk Southern. In that letter, written in reply to a letter from the Greenwood County Tax Assessor, Hawkins stated: "All of the parcels affected by the track removal ... were acquired as an easement only and this easement interest has been extinguished." The Appellants contend that the letter should have been excluded because (1) there was no showing of Hawkins's authority to bind the Railroad, (2) the letter was written to avoid paying property taxes, and (3) the letter could not constitute an admission

---

16. Indeed, sometimes opinions have reflected this ambiguity. *Moragne v. Charleston & W.C. Ry. Co.*, 77 S.C. 437, 440, 58 S.E. 150, 151–52 (1907) (stating that "the railroad company is owner in fee of its right of way").

on the part of the Appellants, because the Railroad is not a party to this lawsuit. They also argue the letter "is of no probative value in this matter."

The trial judge admitted Hawkins's letter pursuant to *Southern Ry. v. Howell,* 79 S.C. 281, 60 S.E. 677 (1908), which involved a lawsuit between a railroad and an abutting landowner over the width of the railroad's right of way. *Howell* reversed the trial court's refusal to admit a letter in which the superintendent of the railroad that had been absorbed by the plaintiff railroad told the abutting landowner's predecessor that the right of way was only fifty feet. The court reasoned that the letter was "intended to give information as to the boundary line" and "was in the nature of an admission against interest." *Howell,* 79 S.C. at 288, 60 S.E. at 679.

Pursuant to Rule 804(b)(3), SCRE, statements against interest are admissible hearsay if the declarant is unavailable, and the statement is "contrary to the declarant's ... proprietary interest." [17] The burden is on the proponent to show one of

---

17. South Carolina has applied the common law rule that a predecessor's statement disparaging his own title during the period of his ownership is admissible against a successor in title who claims through him. *See Wigfall v. Fobbs,* 295 S.C. 59, 367 S.E.2d 156 (1988), *cited in* Danny R. Collins, *South Carolina Evidence* 385 (1995). Some question exists, however, as to whether the rule allowing admissions of predecessors in interest survives the adoption of the South Carolina Rules of Evidence, as such a proposition is not mentioned in the Rules. *See* Danny R. Collins, *South Carolina Evidence* 385 (1995) (discussing Rule 801(d)(2), SCRE). The Rules of Evidence allow liberal introduction of a party's admissions and define them as non-hearsay, because of "the incongruity of the party objecting to his own statement on the ground that he was not subject to cross-examination by himself at the time." Michael H. Graham, *Federal Practice and Procedure* § 6715, at 150 (Interim Ed.1997) (discussing Fed.R.Evid. 801(d)(2)). For this reason, the Rules of Evidence omit any provision allowing introduction of admissions made by predecessors in interest or those in privity to a party, as "considerations of privity and joint interest neither furnish criteria of credibility nor aid in the evaluation of testimony." *Id.* § 6719, at 158 (also citing *Calhoun v. Baylor,* 646 F.2d 1158 (6th Cir.1981)). Appellants did argue to both the trial court and this court that because the Railroad is not a party to this suit, the letter cannot constitute an admission against them.

In any event, the trial court based its ruling on *Howell*'s decision that the letter in that case was an "admission against interest." Since the Rules do not require that an admission be against the party's interest "either when made or when offered, ... [t]he often encountered label

the five types of unavailability in Rule 804(a), SCRE. *Weisman v. Alleco, Inc.*, 925 F.2d 77 (4th Cir.1991). There was no showing whatsoever of unavailability in this case. While the Appellants did argue to the trial court that "we don't know who [Hawkins] is," this was part of Appellant's authority argument, and we decline to read that statement as an objection based on failure to establish unavailability.

However, Appellants did argue that the letter was written to avoid paying property taxes. To be admissible, a statement against interest must be against the declarant's interest at the time it was made. Rule 804(b)(3), SCRE. We agree that the statement made to the tax official that the Railroad held a lesser property interest is a statement in interest to avoid payment of property taxes, rather than a statement against interest. Hawkins's letter is therefore inadmissible under this theory.

█ Even assuming the admissibility of the letter, we do not believe that it is sufficient alone to reasonably infer the existence of a mere easement. As we noted before, we believe that the *Partlow* cases are conclusive evidence that the Railroad sought and obtained a fee simple absolute interest. Thus, this letter essentially would have to operate as a gratuitous conveyance of the fee to the landowners with reservation in the Railroad of an easement, and in the present case such a "gift" would not be enforceable against either the railroad or its successors in title. *Cf. Barnwell v. Barnwell*, 323 S.C. 548, 476 S.E.2d 492 (Ct.App.1996) (To be valid at law, a conveyance of land must be by deed under seal, but good right and title may be given by a parol gift of land, if there is both possession and valuable and permanent improvements.).

█ Finally, by noting the following finding of the trial court, Respondents address in part Appellants' arguments on these issues:

---

'admission against interest' is inaccurate, serves only to confuse, and should be abandoned." Graham, *supra* § 6715, at 150. However, hearsay statements formerly allowed as admissions of a predecessor in interest will likely qualify under another exception, such as the statement against interest provision in Rule 804(b)(3), SCRE. *Cf.* Graham, *supra* § 6719; Collins, *supra* at 385. Because of the questionable status of the "predecessor in interest" rule on admissions, we review the judge's allowance of the letter pursuant to the declaration against interest provision in Rule 804(b)(3), SCRE.

It is significant that the right and title provided under the 1845 Act to the Railroad is ... limited to the Railroad "and their successors," § IX, and does not extend to "assigns," the intent being clear that the Railroad would not have the right to assign its right, title, and interest in and to the land acquired under the Act for an inconsistent use or purpose such as a canal then or a highway now.

The court addressed but did not rule upon a similar point in *Eldridge I*, 300 S.C. at 373 n. 1, 388 S.E.2d at 249 n. 1. The Appellants do not specifically address this particular ruling in their brief, but they do argue the general proposition that Section X allowed the Railroad to condemn a fee simple interest that can be freely assigned.

Section IX contains the only "successor" language in the Act of 1845, which, in delineating the powers of the Railroad, provides that the Railroad "shall have the power and capacity to purchase, take and hold in fee simple or for years, to them and their successors, any lands ... necessary ... to ... locate, run and establish the Railroad." 1845 *S.C.Acts* 326. We assume that any condemned lands under Section X would be subject to any general limitations in Section IX on the Railroad's ability to hold property. In this case, however, the Railroad was alienating property that it both owned in fee simple and *no longer required* to execute its duties as a rail carrier. *See* 74 C.J.S. *Railroads* § 115 (1951); 65 Am.Jur.2d *Railroads* § 48 (1972) (stating that "subject to the limitation against alienation of franchise mentioned above, a railroad has power to alienate its property"). We read the "successor" language as merely preventing the alienation of lands which are still "necessary" for the railroad. Thus, we conclude that the Railroad had the ability to freely alienate any portions of this corridor in which the Railroad held a fee simple interest.

## VI. TITLE BY DEED—JONES TRACT

█ Appellants next challenge the trial court's conclusion that Thomas, Elizabeth, and Robert Jones's express grant in 1849 conveyed only an easement, which was extinguished upon abandonment by the Railroad. We affirm.

Appellants contend that since the 1849 document grants a right of way in general terms, it can be used for any reason-

able purpose, and they cite *Leppard v. Central Carolina Tele. Co.*, 205 S.C. 1, 30 S.E.2d 755 (1944). We disagree.

Our supreme court has construed the language in the exact form deed used by the Railroad in this case. *See Harman v. Southern Ry.*, 72 S.C. 228, 233–34, 51 S.E. 689, 690–91 (1905). The language of the form deed, also quoted in *Harman*, is as follows:

> Whereas, the Greenville and Columbia Railroad Company are about locating their road; and whereas, its passage over the land of the [grantors] may greatly benefit them: Therefore, know all men by these presents, that the [grantors], in consideration of the premises, have given, granted, and released, and by the presents do give, grant, and release, to the said Greenville and Columbia Railroad Company the right of way of sufficient width *for the track, cuts, and embankments of the said road,* as also for turnouts and all other extensions and enlargements, or repair of the same from time to time, not to exceed 100 feet on each side, with the *right to use the earth, stone, and timber within the said tract* for the construction, extension, or repair of the same road. (Emphasis added).

The *Harman* court, in concluding the form deed conveyed the exact interest as the railroad would have acquired by statutory presumption of grant, stated:

> Our construction of the deed is that it was the intention of the grantor to convey such rights, to the full extent, as the railroad would be presumed to have acquired under the statute, in the absence of a written contract between the company and the owner of the land through which the railroad was constructed.

*Id.* at 235, 51 S.E. at 691.

Admittedly, the deed in this case differs from the *Harman* deed in that the Joneses struck through the number in "100 feet" and wrote in the number "33." While the *Harman* court's conclusion was undoubtedly helped by the fact that the "100 feet" language in the form deed comports exactly with the width presumed granted pursuant to Section XI of the Act of 1845, this handwritten reduction of the easement's width does not compel a different conclusion in construing the Jones document. Indeed, the "right to use the earth, stone, and

timber" language would be wholly superfluous if the Joneses had granted a fee, and the "for the track, cuts, and embankments of the said road" language indicates that the easement was granted for railroad purposes only.

The Joneses did, however, insert a handwritten provision into the document, which reads as follows:

> It is further understood ... that should the said Rail Road Company fail to place a fence on the sides of the said road that [the Joneses] shall have the right to cultivate *their lands* to within 10 feet of the road bed. Also, ... RRd Company shall cause to be constructed for the convenience of the [grantors] three crossings, at such points as the [grantors] shall hereafter designate, also such cattle-stops or cow guards, as shall prevent the encroachment of stock upon *the lands of the [grantors]*, at the points when the said Rail Road crosses the fences of the [grantors]. (Emphasis added).

We agree with the trial court that the emphasized language above is consistent with the grant of an easement.

Thus, after applying the precedent in *Harman* and addressing the incidental differences between the two deeds, we conclude that the Jones deed conveyed the same interest as would have been obtained by statutory presumption of grant. We necessarily must conclude, in view of our previous analysis of the statutory presumption of grant section of the Act of 1845, that the easement granted by the Joneses was for railroad purposes only, and was extinguished upon abandonment.

## VII. BURDEN OF PROOF IN QUIET TITLE ACTION

The Appellants finally contend that the Respondents failed to meet their burden of proof for the quiet title action. They note that "in an action to quiet title, the plaintiff must recover on the strength of his own title, not on the alleged weakness of the defendant's title." *Hoogenboom v. City of Beaufort*, 315 S.C. 306, 313, 433 S.E.2d 875, 880 (Ct.App.1992). They argue that "the Plaintiffs have not proven that any of the Plaintiffs owned particular pieces of property adjacent to the Railroad right-of-way." They conclude the trial court order must be reversed. We disagree.

The trial court expressly did not quiet title in favor of any of the Respondents. The order states: "If the Railroad had no title as to any one of these three segments, then the Railroad had no title to convey to the City, County, or Highway Department, and a decision must be made as to whether that title resides in the adjacent property owners ..., or in the heirs of the original property owners.... The [Respondents] have asked the court to defer any decision on this issue pending review of applicable deed records." Later in the order, the court notes: "[The Respondents] have asked the court to defer ruling on this issue pending the introduction of certain deed records recorded following the destruction of the Abbeville County Courthouse in the fire of 1873. Therefore, the record will be held open for that purpose."

The trial court's order thus merely declared that the nature of the Railroad's interest in the former rail corridor was an easement only, and that this easement had been abandoned. The court also made rulings relative to the Appellants' adverse possession of portions of the corridor, as well as to the Appellants' independent acquisition of rights of way from adjoining property owners. The court left for future determination the question of which Respondents got what portion of any reversionary interests. We thus reject Appellants' argument that *Hoogenboom* requires reversal of the court's order.

## VIII. CONCLUSION

We affirm the trial court's ruling that the Railroad's interest in the statutory presumption of grant and in the Jones segments was an easement that was extinguished upon abandonment. However, we reverse the trial judge's ruling as to the Partlow property and hold that the evidence is only susceptible of the inference that the Railroad had a fee simple absolute in that property. We also hold the trial court's order should not be reversed because of the alleged failure of the Appellants to meet their burden of proof in the quiet title action. Accordingly, we

**AFFIRM IN PART AND REVERSE IN PART.**

HOWELL, C.J., and HOWARD, J., concur.