728 S.E.2d 484

**James T. JUDY and Bobby Judy, Appellants/Respondents,**

**v.**

**S. Scott KENNEDY and Beau D. Kennedy, Respondents/Appellants.**

**No. 4976.**

Court of Appeals of South Carolina.

Heard April 12, 2012.

Decided May 23, 2012.

472

---

Capers G. Barr, III, of Charleston, for Appellants/Respondents.

James E. Chellis, of Summerville, for Respondents/Appellants.

KONDUROS, J.

Beau D. and S. Scott Kennedy (collectively the Kennedys) erected a front gate and a back gate across an ingress and egress easement, respectively, belonging to James T. and Bobby Judy (collectively the Judys). The Judys appeal the master's ruling the locked front gate can remain in place, and the Kennedys appeal the master's finding the Judys did not abandon the easement. We affirm as modified.

## FACTS

In 1973, Tina and T.C. Kennerty subdivided 195 acres of land located in Dorchester County into three parcels. Tina became owner of two tracts of land, one approximately 12 acres and another approximately 85 acres. T.C. became the owner of a 97–acre tract situated between the 12–acre and 85–acre tracts. Each granted to the other the right to use a 50–foot access easement across the tracts for ingress and egress. Crooked Creek Drive is a fifteen-foot-wide dirt road located mostly inside the easement although the road exits the easement and cuts across adjacent property for a short period because of trees that currently are an obstruction.

Tina's property was ultimately deeded to the Judys. James has harvested timber from the 85 acres and uses it regularly to host organized deer hunts.[1] He testified he may put mobile homes on the property in the future and will continue to harvest timber possibly with larger equipment. He envisions using Crooked Creek Drive to access the land for these activities. T.C.'s property was conveyed to Scott Kennedy. Scott renovated and occupied a mobile home located at the northern end of his 97–acre tract and constructed a bathhouse, pavilion, and three tree houses overlooking the Edisto River further south. He operated the property as a camp and wildlife preserve and now leases the property to a company for the same purpose. Scott conveyed 9.8 acres at the northwest portion of his 97 acres to his son, Beau. This included the mobile home, which Beau expanded. Beau eventually erected a new home on the property. In 1995, the Judys conveyed a portion of the twelve-acre tract to another party. The deed of

---

1. At these hunts, hunting dogs are released and chase deer back to the deer stands where hunters are waiting.

conveyance did not specifically reserve an easement across the land in the Judys' favor.

In late 2007, Beau erected a substantial gate across Crooked Creek Drive at the point where it enters his property. The gate, supported by brick pillars, leaves approximately a twelve-foot-eight-inch-wide opening for vehicles to pass through. The gates can be opened by either a handheld electronic device or a stationary electronic pad mounted away from the gate. As one leaves Beau's property, the gates open automatically when a buried sensor is activated. Sometime later, Scott installed a less substantial metal gate in the easement near the point on the 97–acre tract as it turns to the 85–acre tract. The gate is not across the road bed of Crooked Creek Drive but just south where Crooked Creek Drive exits the easement. After this suit was commenced, Beau provided James with one handheld electronic key to the front gate.

At trial, Beau testified people drove on Crooked Creek Drive although he could generally not determine if they were hunters or not. On one occasion, he had a contentious encounter with a hunter as to who would yield the roadway. In another instance, he came home and found a child he did not know in his home without his permission. This is primarily what prompted him to erect the gate. Beau testified hunting dogs had been in his yard at times but this was not really a concern to him. He further stated the hunts mostly take place on Saturdays and that he did not really even see the hunters entering or exiting the property when he is in his front yard or driveway. James testified the gates unreasonably interfere with the use of his property, particularly for hosting deer hunts, and he is concerned it will impede the possibility of continuing to harvest timber or bring in mobile homes.

The master determined Beau was entitled to keep the front gate in place for the protection of his property and that the front gate did not unreasonably interfere with the Judys' use of their property. The master required Beau to also provide Bobby with an electronic opening device for the gate. He further concluded the possibility of bringing mobile homes to the 85–acre tract or requiring larger equipment for harvesting timber was too speculative. Finally, he concluded the second

gate should be removed as it did not appear to protect any interest of the Kennedys. The master supplemented his original order with the finding that the easement was not abandoned by the Judys. These cross-appeals followed.

## LAW/ANALYSIS

### I. The Judys' Appeal [2]—The Reasonableness of the Front Gate

██ The Judys contend the master erred in finding the front gate was needed for the protection of the servient estate and in the alternative finding it reasonable that the gate remain locked with the only access being two electronic devices. We agree in part.

█ "In an appeal of an equitable action tried before a master authorized to enter final judgment, this Court must review the entire record and make its own findings of fact according to its view of the preponderance of the evidence." *Thomas v. Mitchell,* 287 S.C. 35, 37, 336 S.E.2d 154, 155 (Ct.App.1985). "This requirement does not, however, command us to ignore the findings of the trial judge who heard the witnesses." *Id.* at 38, 336 S.E.2d at 155.

█ "[T]he general rule is that the owner of the servient estate may erect gates across an easement if they (1) are so located, constructed[,] and maintained as not to unreasonably interfere with the right of passage of the dominant estate, (2) are necessary for the preservation of the servient estate, and (3) are necessary for use of the servient estate." *Brown v. Gaskins,* 284 S.C. 30, 33, 324 S.E.2d 639, 640 (Ct.App.1984).

█ "Whether the owner of land over which a right of way runs is justified in erecting a locked gate across it depends upon the circumstances. No hard and fast rule may be prescribed. Each case must be controlled, in large measure, by the particular facts and circumstances of the case." *Thomas,* 287 S.C. at 39, 336 S.E.2d at 156. (internal citations

---

2. We address all four of the Judys' issues on appeal together as they all relate to the same facts and the applicable law to all questions is essentially whether the master's resolution sufficiently protects the Kennedys' interests without unreasonably burdening the Judys.

omitted). The court has "applied a balancing test to determine the reasonableness of placing a gate across an easement." *Id.*

Beau demonstrated some need to keep trespassers off his property. His main concern had been that a child, unknown to him, was in his home without his permission. Other complaints involved persons, not necessarily members of James's hunt club, being on Crooked Creek Drive. However, Beau testified to only one specific instance of a confrontation. Unlike other cases in which locked gates have been found necessary, there are no allegations of vandalism or littering on Beau's property. *See Thomas,* 287 S.C. at 37, 336 S.E.2d at 155 (finding need to protect servient estate when plagued by trespassers, night hunters and vandals who drove vehicles over planted fields); *Brown,* 284 S.C. at 32, 324 S.E.2d at 640 (finding need to protect servient estate when trespassers vandalized and littered property and broke into homes located thereon); *Ballington v. Paxton,* 327 S.C. 372, 376–77, 488 S.E.2d 882, 885 (Ct.App.1997) (finding need to protect servient estate when trespassers littered at pond, vandalized pond house, and shot firearms on property). Therefore, the necessity of protecting the servient estate here is not as significant as in those cases.

On the other side of the scale, the burden placed on the Judys in accessing their property is substantial under the specific facts of this case. Were the activities of the Judys more limited, the provision of two remote control keys to James and Bobby might be sufficient and not place an unreasonable burden on the dominant estate. However, James utilizes the 85–acre parcel for hosting hunts for his hunt club. As a property owner, he is permitted to use the land in that manner and has done so for many years. Because the 85 acres is bisected by a swamp, the northern portion of it can only be accessed via Crooked Creek Drive. Hunters may enter the property from that direction, and hunters may need to access that area to collect their dogs at the end of a hunt. However, any arguments regarding the width of the gate are not persuasive as to the complete removal of the gate. The testimony did not establish that the gate could not remain in place and allow larger vehicles to pass. Beau testified the gate is not currently programmed to open to its widest

potential, which would be approximately fourteen and one-half feet. He testified the gates can also be removed entirely from the pillars in about fifteen minutes which would provide an opening of approximately fifteen feet. James testified the narrowest mobile home one can purchase is approximately fourteen-feet wide and the widest equipment he might use for timbering and clearing would be around fourteen-feet wide.

On balance, the existence of the gate is not an unreasonable burden on the dominant estate. However, locking the gate and providing only two electronic keys to James and Bobby, under the circumstances of this case, is not the resolution that best balances the equities of the parties. Therefore, so long as the gate remains in its current location and locked, Beau must provide James and Bobby Judy with the current numeric code to unlock the gate as well as the two remote opening devices already provided. Furthermore, Beau must apprise the Judys of any change in the numeric code in a timely manner.

## II. The Kennedys' Appeal—Abandonment of the Easement

The Kennedys argue the master erred in concluding the Judys had not abandoned the easement because they failed to specifically reserve an easement for themselves when they conveyed a portion of the twelve acres and because they did not use the easement exactly as designated on the Chewing plat. We disagree.

"[T]ermination of an easement by abandonment is a factual question in an action at law...." *Eldridge v. City of Greenwood*, 331 S.C. 398, 416, 503 S.E.2d 191, 200 (Ct.App. 1998). In a law case tried by the judge without a jury, this court reviews for errors of law and reviews factual findings only for evidence which reasonably supports the court's findings. *Id.*

> [A]n easement may be lost by abandonment and in determining such question the intention of the owner to abandon is the primary inquiry. The intention to abandon need not appear by express declaration, but may be inferred from all of the facts and circumstances of the case. It may be inferred from the acts and conduct of the owner and the

nature and situation of the property, where there appears some clear and unmistakable affirmative act or series of acts clearly indicating, either a present intent to relinquish the easement, or purpose inconsistent with its further existence. *Carolina Land Co., v. Bland,* 265 S.C. 98, 109, 217 S.E.2d 16, 21 (1975). The burden of proof is upon the complaining party to show the abandonment by clear and unequivocable evidence. *Id.*

The burden is on the Kennedys to establish the Judys abandoned the easement. That burden is a high one that cannot be satisfied by mere nonuse. *See Witt v. Poole,* 182 S.C. 110, 115, 188 S.E. 496, 499 (1936) ("The authorities are harmonious in holding that mere nonuse[ ] of an easement created by deed for a period however long will not amount to an abandonment, except where otherwise provided by statute, or by the deed itself."). The record established the Judys used the easement, although not precisely as platted due to an area of old trees obstructing the way. Additionally, the failure to specifically reserve an easement in themselves when conveying a portion of the property does not establish a clear intent to abandon the easement when the deed refers to the Chewing plat, which shows the easement. These facts do not establish a clear intent by the Judys to abandon the easement. Thus, the master's ruling is supported by the record and is affirmed.

## CONCLUSION

In balancing the need to protect the servient estate against the right of the dominant estate to have reasonable access to property, we conclude if the front gate is to remain locked, Beau must provide each of the Judys with an electronic handheld key and the numeric code for the keypad. Furthermore, we affirm the master's ruling the Judys did not abandon the easement.[3] Accordingly, the ruling of the master is

**AFFIRMED AS MODIFIED.**

PIEPER and GEATHERS, JJ., concur.

---

**3.** Nothing in this opinion shall be construed to prevent the parties from seeking any future relief should the circumstances change.